NATIONAL ASSOCIATION FOR THE ADVANCE-
MENT OF COLORED PEOPLE ET AL. v.
OVERSTREET.

No. 505.  Argued March 29, 1966.—Decided April 27, 1966.

*Robert L. Carter* argued the cause for petitioners.
With him on the brief were *Anne Gross Feldman, Maria
L. Marcus* and *Barbara A. Morris.*

*Hugh P. Futrell, Jr.,* submitted the cause on a brief
for respondent.

PER CURIAM.

The writ of certiorari is dismissed as improvidently
granted.

MR. JUSTICE DOUGLAS, with whom THE CHIEF JUSTICE,
MR. JUSTICE BRENNAN and MR. JUSTICE FORTAS concur,
dissenting.

In May 1962, a 14-year-old Negro boy complained to
his school principal and to his mother that he had been
mistreated by respondent.  The boy claimed that re-
spondent, the owner of a market at which the boy was
employed, had accused him of stealing merchandise and
had thereafter slapped and kicked him.  The truth of
this charge remains disputed.  The boy's mother, dis-
satisfied with the response of the local police, contacted
the Savannah Branch of the National Association for
the Advancement of Colored People.  The Branch re-
sponded by organizing a campaign to withhold patronage
from respondent.  Pickets were established, and cus-
tomers were asked to refrain from shopping in the

market. Although the record does not contain any evidence of misconduct on the part of the Branch's members or officers, the picketing apparently attracted substantial crowds. There were incidents involving the intimidation of customers, blocking of sidewalks, and scattered incidents of violence. The trial judge instructed the jury that it might hold the Branch responsible for the respondent's damages if it found that the picketing was the "proximate cause" of the misconduct of others.[1] The judge further instructed the jury that should it hold the Branch liable, it might also hold petitioner—the national NAACP—if the Branch were found to be its "agent." The jury held both the Branch and petitioner liable. Damages totaling $85,793 were assessed: this figure includes $50,000 in punitive damages. The Georgia Supreme Court affirmed, 221 Ga. 16, 142 S. E. 2d 816, and we granted certiorari, limited to the question of whether holding petitioner, the national organization, liable "for acts performed without its knowledge and by persons beyond its control" denied it rights secured by the Fourteenth Amendment. 382 U. S. 937.

Respondent has suffered economic loss as a result of the conduct of those who blocked his sidewalk and threatened his customers. I assume that nothing in the Constitution bars recovery for his injuries from those individuals. See *Giboney* v. *Empire Storage Co.,* 336 U. S. 490. The courts below found that the Branch was responsible for these injuries, and no questions as to that aspect of the case are now before us. We have only the question whether, given the liability of the Branch, peti-

---

[1] "I charge you that in this case you can consider the effect of the picket[ing]. Did . . . the fact that the pickets were there incite activity upon people who were not at all connected with the organization[?]; and if that was incited by the pickets, *by their mere presence,* you could consider the pickets and the placing of the pickets as the proximate cause of what resulted." (Emphasis added.)

tioner, the national NAACP, may be held responsible for respondent's loss—and for the punitive damages imposed.

The amended complaint alleged that W. W. Law, an officer of the Branch, "in using such tactics, was acting in and for the services" of petitioner "as its agent, employee, and servant, within the scope of said agency, employment and service." That allegation was denied by petitioner and the record does not contain one iota of proof that petitioner controlled, authorized, or even knew of these activities.

Petitioner is a nonprofit corporation organized in New York for the purpose of promoting equality of treatment for Negro citizens.[2] The Branch is concededly an affiliate of that national organization. A portion of the dues it collects is forwarded to the national, and members of the local branch are automatically members of the national organization. Members of the local association can and do attend the annual national convention at which they participate in workshops and discussions relating to NAACP activities. The Branch makes an annual report of its activities to the national NAACP.

That, for all the record shows, is the full extent of the relations between petitioner and the Branch. There is no evidence of any power on the part of petitioner to control the conduct of the Branch. There is no evidence of any effort in past years by petitioner to exercise such control. The Branch officers were not, for all the record shows, national officers. The petitioner did not order the

---

[2] See *N. A. A. C. P.* v. *Alabama*, 357 U. S. 449, 451–452. Its certificate of incorporation states that its principal objectives are "voluntarily to promote equality of rights and eradicate caste or race prejudice among the citizens of the United States; to advance the interest of colored citizens; to secure for them impartial suffrage; and to increase their opportunities for securing justice in the courts, education for their children, employment according to their ability, and complete equality before the law." *Ibid.*

demonstrations nor did it authorize them. The record affirmatively shows that petitioner had no knowledge of the demonstrations against respondent and did not learn of them until it was sent the restraining order that was served upon the Branch president. And nothing in the record suggests "ratification"—even by inaction over a sustained period—of the local's activities against respondent or of similar activities.

The standards by which the trial court allowed this "agency" to be measured were, to say the least, unclear. The trial judge instructed the jury that the petitioner was a New York corporation which could "only be represented in Georgia by agents, and the agents must conduct themselves in a manner that is compatible with the purposes of that organization." He then instructed as follows:

> "Now did the National Association for the Advancement of Colored People have an agent in Savannah? Who was that agent? Was it W. W. Law [the Branch's president]? . . . Is the National Association responsible for what this affiliate does? . . . Are they so connected that one is responsible for the act of the other by reason of the agency; by reason of their concerted activities as expressed in this conspiracy? *As the Court sees it, you can't get agency and conspiracy separated in this case.* A corporation may be a member of a conspiracy if its officers and agents take part in it and it furthers the conspiracy. You look to the evidence and see if it preponderates as to these organizations. Was there an agency that bound the National Association . . . ? Did they participate through their agents and members and people who had a right to bind them in this conspiracy?" (Emphasis added.)

These instructions, to which the defendants excepted and assigned as error on appeal, gave the jury little guidance as to the circumstances in which it would be appropriate to hold liable the national NAACP. The remarks of the trial judge in considering petitioner's motion for a nonsuit are, in this respect, revealing: "[S]o far as the evidence is concerned, there [is] no evidence to the effect that any member [of the Branch] was the agent of the national corporation. *In other words, they were just affiliated."* (Emphasis added.)

To equate the liability of the national organization with that of the Branch in the absence of any proof that the national authorized or ratified the misconduct in question could ultimately destroy it. The rights of political association are fragile enough without adding the additional threat of destruction by lawsuit. We have not been slow to recognize that the protection of the First Amendment bars subtle as well as obvious devices by which political association might be stifled. See *Bates* v. *Little Rock,* 361 U. S. 516, 523. Thus we have held that forced disclosure of one's political associations is, at least in the absence of a compelling state interest, inconsistent with the First Amendment's guaranty of associational privacy. *E. g., DeGregory* v. *New Hampshire,* 383 U. S. 825; *Gibson* v. *Florida Legislative Comm.,* 372 U. S. 539, 543–546; *Shelton* v. *Tucker,* 364 U. S. 479; *N. A. A. C. P.* v. *Alabama,* 357 U. S. 449, 462–463. Recognizing that guilt by association is a philosophy alien to the traditions of a free society (see *Schware* v. *Board of Bar Examiners,* 353 U. S. 232, 245–246) and the First Amendment itself, we have held that civil or criminal disabilities may not be imposed on one who joins an organization which has among its purposes the violent overthrow of the Government, unless the individual joins knowing of the organization's illegal purposes (*Wieman* v. *Updegraff,* 344 U. S. 183) and with

the specific intention to further those purposes. See *Elfbrandt* v. *Russell, ante,* p. 11; *Aptheker* v. *Secretary of State,* 378 U. S. 500.

The present case contains no less a threat to political association. That the threat comes in the form of civil suits for damages rather than that of direct governmental restraints is of no consequence as we noted in *New York Times* v. *Sullivan,* 376 U. S. 254, 265. Today a judgment of more than $80,000 is fastened on the national NAACP. Juries hostile to the aims of an organization in the educational or political field, unless carefully confined by meticulous instructions and judicial supervision, can deliver crushing verdicts that may stifle organized dissent from the views and policies accepted by the majority.

This case thus carries us into territory in which principles of state law must be accommodated with overriding federal precepts. The law of agency which a State chooses to follow functions, for the most part, free of constitutional restraint; in our federal system, each State may regulate the relations between principal, agent, and third parties according to its own standards of fairness and sound policy. But when a state policy thwarts interests which the Federal Constitution affords special protection, that state policy must yield. For example, though state law customarily determines whether a particular contract is enforceable, notwithstanding the applicable commercial law a state court may not enforce covenants restricting sale of real property to non-whites. *Shelley* v. *Kraemer,* 334 U. S. 1. While the States may preserve order on the public streets and punish conduct constituting a "breach of the peace" as defined by local law, peaceful expression may not, regardless of the label put upon it, be punished. *Cantwell* v. *Connecticut,* 310 U. S. 296. And see *Edwards* v. *South Carolina,* 372 U. S. 229. Questions of legislative apportionment, though pri-

marily matters of state law, must be resolved in compliance with the Federal Equal Protection Clause. *Reynolds* v. *Sims,* 377 U. S. 533. The same is true of voter registration, *Harper* v. *Virginia State Board of Elections,* 383 U. S. 663. State regulation of the practice of law—more specifically, the rules regarding solicitation of legal business—must yield in favor of the First Amendment right to join together in a common effort to assert legal rights. *N. A. A. C. P.* v. *Button,* 371 U. S. 415; *Railroad Trainmen* v. *Virginia Bar,* 377 U. S. 1.

In *N. A. A. C. P.* v. *Button, supra,* we rejected the State's claim that "solicitation" of legal business is outside the area of freedoms protected by the First Amendment. We said that "a State cannot foreclose the exercise of constitutional rights by mere labels." 371 U. S., at 429. So it should be in this case. Terms such as "agency" and "affiliation" have no talismanic significance. In the context of this case, they obscure rather than promote sound analysis. The question we must answer is whether a national political association can be held responsible for wrongs committed by those beyond its control in a constitutional system where freedom of expression and association is treasured.

The threats which political organizations of this kind today face were once a great burden on labor unions.[3] Congress acted to relieve that burden by enacting § 6 of the Norris-LaGuardia Act:

> "No officer or member of any association or organization, and no association or organization participating or interested in a labor dispute, shall be held responsible or liable in any court of the United States

---

[3] The burdens of civil suits for damages were felt by the trade union movement in Great Britain as well as in this country. See Webb, Sidney and Beatrice, The History of Trade Unionism 597–604 (1965 ed.); Cole, The British Working-Class Movement 292–296 (1948).

for the unlawful acts of individual officers, members, or agents, except upon clear proof of actual participation in, or actual authorization of, such acts, or of ratification of such acts after actual knowledge thereof." 47 Stat. 71.

See *Brotherhood of Carpenters* v. *United States,* 330 U. S. 395. We recently held in *United Mine Workers* v. *Gibbs,* 383 U. S. 715, that an international union could not be held liable for the tortious conduct of a local in the absence of "clear proof" of "participation, authorization, or ratification" by the international union.

We have of course no like statute here. But the First Amendment, which commands vigilance lest the rights it assures be denied the "breathing space" (*N. A. A. C. P.* v. *Button, supra,* 433) necessary for survival, provides guidance. In my view, it forbids the imposition of liability on a national political association on account of the misconduct of a local branch without proof that the national organization specifically authorized or ratified the conduct for which liability is sought to be imposed. A *general* finding of "agency" or "affiliation" is not enough.[4] In the present case, the record discloses

---

[4] The factors on which the Georgia Supreme Court relied to sustain the finding of "agency" fall far short of showing any specific authorization by petitioner to the Savannah Branch to engage in the conduct condemned below. It emphasized the following points: (1) both the local and the national organizations use the name "N. A. A. C. P."; (2) the petition was served on the Branch president as petitioner's agent, and petitioner made no objection; (3) the Savannah Branch and petitioner shared certain common objectives; (4) members of the Branch were automatically members of the petitioner and a portion of their dues was forwarded to New York; and (5) at national conventions, members of the local were counseled in methods of furthering their efforts in the local district through discussions and workshops. In addition, the court suggested that if there was in fact no agency relation, petitioner "had the option to repudiate or ratify the act, but [it was] required to

at most a loose relationship between petitioner and this independently controlled Branch.   This record discloses no specific authorization or ratification by petitioner of the acts which the Georgia courts found tortious.   Nor is there any evidence of any participation by petitioner in such conduct.   The trial judge himself stated that there was no "agency" shown, but only an "affiliation" between petitioner and the local Branch.   So weak a link cannot, for the reasons I have stated, warrant holding the national NAACP responsible for the damages sustained.

I would reverse this judgment.

---

do one or the other.   And where, as here, [it] never repudiated the act, [it is] deemed to have affirmed it."

The record is clear that the first notice petitioner had of the Savannah demonstrations was when the restraining order was forwarded to it in New York.   By this time, the temporary restraining order was in effect.   There was, therefore, no opportunity for petitioner to exercise a moderating influence on the local branch.   Compare *United Mine Workers* v. *Gibbs, supra,* where the national union had knowledge of the local's violent conduct and never expressly disavowed it; we held, nonetheless, that there had been no ratification although we noted that had it made some public statements condemning the violence "our result would undoubtedly be firmer." *Id.,* at 742.   Moreover, petitioner specifically denied respondent's allegations of agency in its answer filed shortly after the suit was begun.

The more demanding requirements of proof which I believe must be met would be satisfied, for example, in a case where the Branch incurred some liability arising out of its collection of dues.   I would expect that since the dues paid to the Savannah Branch are, in part, collected on behalf of the national organization, it would be a simple matter to show specific authority to engage in that activity.   Perhaps it might be possible to show specific authorization to engage in the conduct involved in this case; the record does not, for example, show what manner of advice and counsel is given the Branch at national conventions.   Whether respondent could meet his burden of proof cannot, of course, be determined from the meager record before us.