**ALLSTATE BEER, INC., Plaintiff,**

**W. E. Strickland, State Revenue Commissioner, Plaintiff-Intervenor,**

v.

**JULIUS WILE SONS & CO., INC.**

Civ. A. No. C–78–1090–A.

United States District Court,
N. D. Georgia,
Atlanta Division.

March 30, 1979.

Paul L. Hanes, Atlanta, Ga., for plaintiff.

David A. Runnion, Atlanta, Ga., for plaintiff-intervenor.

H. Lamar Mixson, Jr., Atlanta, Ga., for defendant.

## ORDER

HENDERSON, District Judge.

The above styled action was originally filed in the Superior Court of Fulton Coun-

ty and later removed to this court. Allstate Beer, Inc. (hereinafter referred to as "Allstate") filed suit against Julius Wile Sons & Co. (hereinafter referred to as "Julius Wile") for tortious interference with its contractual relationship with North Coast Cellars d/b/a Souverain Cellars (hereinafter referred to as "North Coast"). Julius Wile filed a counterclaim for a declaratory judgment that a part of the Georgia scheme for the regulation of alcoholic beverages, Ga. Code Ann. § 58–809, and the regulations promulgated thereunder, Reg. 560–8–7–.08(1) through (10), are unconstitutional. By order of December 15, 1978, the State Revenue Commissioner of Georgia, W. E. Strickland (hereinafter referred to as the "Commissioner"), was permitted to intervene to protect the state's interest in preserving its regulation of this industry. He is more correctly cast as a defendant on the counterclaim, since he does not seek any affirmative relief from the defendant, the plaintiff on the counterclaim. Presently pending is the motion of Julius Wile for judgment on the pleadings on its counterclaim, the Commissioner's motion for summary judgment on the counterclaim, and cross-motions for summary judgment.

> Ga. Code Ann. § 58–809 states that: [each shipper of wine into the state] shall designate in the application for registration sales territories for each of its brands sold in Georgia, and shall name one licensed wholesaler in each territory who, within such territory, shall be the exclusive distributor of such brand within such territory. Such designations of wholesalers or wholesalers' territories shall be initially approved by the commissioner and shall not be changed nor initially disapproved except for cause and the commissioner shall determine cause after a hearing under regulations promulgated by the commissioner for such purposes.

Reg. 560–8–7–.08(5)(h) provides that:

> Business reasons which may be considered by the State Revenue Commissioner in determining cause for authorizing a change of wholesalers or to change the territory of a designated wholesaler will include:

> 1. a wholesaler's bankruptcy or serious financial instability . . .,

> 2. a wholesaler's repeated violations of any provisions of federal or state law or regulations . . .,

> 3. a wholesaler's failure to maintain sales volume consistent with the sales volumes of other wholesalers of that brand, or a wholesaler's failure otherwise to promote the product effectively,

> 4. any other factors relevant to such proposed change and which aid the Commissioner in determining cause.

The following facts are undisputed. In August of 1976, North Coast filed with the Georgia Department of Revenue (hereinafter referred to as the "Revenue Department") a designation making Allstate its exclusive wholesaler for the state of Georgia. After North Coast and Julius Wile entered into an agreement granting Julius Wile certain distribution rights, Julius Wile filed, on May 12, 1977, an application to make Georgia Crown Distributing Co. its sole Georgia wholesaler. In a ruling issued on December 8, 1977 (hereinafter referred to as the "Revenue Ruling"), the Revenue Department construed the application as one for a *change* in the designation of an exclusive wholesaler for North Coast's wines, and determined that Julius Wile had not followed the proper procedures for effecting a change in wholesalers, as opposed to the designation of a new wholesaler. (Revenue Ruling, at 7–8). The Revenue Ruling nevertheless found that cause for terminating Allstate as North Coast's exclusive wholesaler had not been established under Reg. 560–8–7–.08(5)(h). (Revenue Ruling, at 8). The Revenue Department also considered and rejected Julius Wile's claims that the Georgia regulatory concept was unconstitutional. (Revenue Ruling, at 8–11). It permitted Allstate to remain as the exclusive wholesaler for North Coast until a change was approved by the Revenue Department, but refused to prohibit Julius Wile from shipping products other than North Coast wines into the state. (Revenue Ruling, at 12).

The plaintiff complains that the defendant failed to exhaust applicable state remedies before challenging the Georgia laws and regulations in federal court. This contention lacks merit. The Supreme Court of Georgia makes clear that the Commissioner's decision is the last step in the state administrative procedure and that the only remedy available to one aggrieved thereby is a resort to the state courts by way of a suit in equity. *Blackmon v. Alexander,* 233 Ga. 832, 213 S.E.2d 842 (1975). Of course, the fact that state courts are presumably open to the defendant is not a bar to federal court diversity jurisdiction. Therefore, even assuming *arguendo* that exhaustion of state administrative remedies would be required, see *Ellison v. Califano,* 546 F.2d 1162 (5th Cir. 1977); *Litton Systems, Inc. v. Southwestern Bell Tel. Co.,* 539 F.2d 418, *reh. den.* 542 F.2d 1173 (5th Cir. 1976), the defendant has reached the end of its available state administrative trail.

Julius Wile first challenges the Georgia regulations as violative of the Sherman Antitrust Act, 15 U.S.C. §§ 1 *et seq.,* and, thus, the Supremacy Clause of the U.S. Constitution, Art. VI, cl. 2. Because Julius Wile does not charge that Allstate is acting in violation of the federal antitrust laws, but rather attacks the regulatory program itself, the counterclaim is actually in the nature of a suit against state officials who supervise the distribution of alcoholic beverages. Indeed, as noted above, the Commissioner is more properly denominated a defendant on the counterclaim.

This distinction is crucial in an antitrust case. In a line of cases beginning with *Parker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) the Supreme Court has defined the parameters of the "state action" exemption to the federal antitrust laws. If the suit is against state officials individually for violating the antitrust laws in the administration of a certain state program, the Court has routinely held that the "state action" exemption applies. *New Motor Vehicle Bd. of California v. Orrin W.*

*Fox Co.,* 439 U.S. 96, 99 S.Ct. 403, 58 L.Ed.2d 361 (1978); *Exxon Corp. v. Governor of Maryland,* 437 U.S. 117, 98 S.Ct. 2207, 2217–18, 57 L.Ed.2d 91 (1978); *Bates v. State Bar of Arizona,* 433 U.S. 350, 359–63, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977); see also, *City of LaFayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978); *cf. Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975); *Schwegmann Bros. v. Calvert Distillers Corp.,* 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035 (1951). In *Bates,* after noting that the suit was against the state officials themselves, *Bates, supra,* 97 S.Ct. at 2697, the Court looked to two other factors to determine the "state action" exemption. First, the state's purpose in regulating the conduct in issue was examined. Quite naturally, it found that the state had a strong interest in regulating the practice of law. *Id.,* at 2697–98. That concern is certainly no greater than the state's interest in regulating the distribution of alcoholic beverages, a task traditionally left to the states. U.S.Const., Art. XXI, § 2. Finally, the Court considered whether the activity in question was instigated by a private party and merely acquiesced in by the state or whether there was a clearly defined governmental policy actively pursued by the state. *Bates, supra,* at 2698. As described earlier, the Georgia regulations obviously fit that description. Moreover, that the state has a carefully designed program is evident in a comprehensive study, published by the Revenue Department in 1975, of the Georgia alcoholic beverage regulatory system, "An Inquiry Into Prices and Pricing Policies of Distilled Spirits and Malt Beverages in Georgia" (hereinafter referred to as the "Study").[1] The Study pointed out that the system of "exclusive sales territories" had been in operation in Georgia since the legalization of alcoholic beverages following the repeal of prohibition. (Study, at 19). The primary purpose in developing the system

---

1. Julius Wile criticizes this Study as being "mere conclusory opinions and conjectures and not entitled to consideration under Rule 56(e)." This objection is without merit.

was the desire to enforce Georgia's local option, which allows counties to remain "dry" if they so elect, by providing a means by which the diversion of alcoholic beverages from "wet" to "dry" counties could be traced. (Study, at 21). Other considerations were the prevention of monopolistic control by a few wholesalers and the exertion of undue economic pressure by producers. (Study, at 22). The Study concluded that the plan was sound and served to further its stated purpose (Study, at 49) while at the same time having "no significant effect upon the retail price of beverage alcohol." (Study, at 2).[2]

In sum, the Georgia regulations fall within the "state action" exemption to the Sherman Act and, hence, are not violative of that act or the Supremacy Clause.

◼ Julius Wile also contends that the Georgia regulatory scheme violates the Commerce Clause. Citing the Twenty-first Amendment, the Supreme Court made it clear that, "a State is totally unconfined by traditional Commerce Clause limitations when it restricts the importation of intoxicants destined for use, distribution, or consumption within its borders." *Hostetter v. Idlewild Bon Voyage Liquor Corp.*, 377 U.S. 324, 330, 84 S.Ct. 1293, 1297, 12 L.Ed.2d 350 (1964).

Under the Twenty-first Amendment, Georgia could absolutely prohibit the importation of alcoholic beverages into the state. Instead, it chose to leave the "wet" or "dry" decision with the individual counties. As a means of controlling and preserving its local option plan, the state afforded itself an easy means of tracing the deviation of alcoholic beverages from "wet" into "dry" counties, a judgment undoubtedly left to the exclusive control of the states by the Twenty-first Amendment. *Hostetter, supra*, at 333, 84 S.Ct. 1293. See also, *Craig v. Boren*, 429 U.S. 190, 204–07, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); *California v. LaRue*, 409 U.S. 109, 114–15, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972); *United States v. Frankfort Distilleries*, 324 U.S. 293, 299, 65 S.Ct.

661, 89 L.Ed. 951 (1945); *Parks v. Allen*, 426 F.2d 610, 613 (5th Cir. 1970); *Mayhue's Super Liquor Store, Inc. v. Meiklejohn*, 426 F.2d 142, 147, n. 11 (5th Cir. 1970).

◼ The defendant's argument that the Georgia statute is unconstitutionally vague is equally without merit. The regulations define with sufficient precision the criteria determining "cause" to allow a change of designation of wholesalers. In *C. A. May Marine Supply Co. v. Brunswick Corp.*, 557 F.2d 1163, 1167 (5th Cir. 1977), the court held that a statute with similar factors was not unconstitutionally vague; in fact, the court said that an argument to the contrary was "frivolous". See also, *Atlanta Bowling Center, Inc. v. Allen*, 389 F.2d 713 (5th Cir. 1968).

Julius Wile next attacks the Georgia regulations as violative of the due process clauses of both the federal, U.S.Const., Art. XIV, and State, Ga. Code Ann. § 2–101, Constitutions. More specifically, the defendant says that the regulations unduly interfere with his right to enter into contracts and are, therefore, in conflict with substantive due process.

◼ According to the Court of Appeals for the Fifth Circuit only a "clear showing" of arbitrariness would allow a court to substitute its judgment for that of the state legislature in the area of regulation of the alcoholic beverages industry. If the state's law is "arguably reasonable," it should be sustained. *Parks v. Allen, supra*, at 613–14. See also, *Trustees of Mortgage Trust of America v. Holland*, 554 F.2d 237 (1977); *Barnes v. Merritt*, 428 F.2d 284, 288 (5th Cir. 1970). The Georgia courts established a similar standard for determining a statute's compliance with substantive due process. In *DeBerry v. City of LaGrange*, 62 Ga.App. 74, 8 S.E.2d 146 (1940), the court recognized that, while the right to earn a living and to enter into contracts was protected by the due process clause of the state constitution, the state could impose reasonable restrictions thereon, and could prohibit

---

**2.** Interestingly, the Study noted that the "assigned territories" system would be in violation of the Sherman Act if practiced by private parties.

the exercise of some vocations altogether. Moreover, "unless the regulations are so utterly unreasonable and extravagant that the property and personal rights of the citizens are unnecessarily, and in a manner wholly arbitrary, interfered with or destroyed without due process of law, they do not exceed the limits of the police power." *Clein v. City of Atlanta*, 164 Ga. 529, 535, 139 S.E. 46, 49 (1929).

It cannot be said that the statute and regulations here are "wholly arbitrary"; they are, at the least, "arguably reasonable." The fact that there might be a better or less intrusive way to regulate the flow of alcoholic beverages is not pertinent to the inquiry at hand. Indeed, by virtue of the Twenty-first Amendment, Georgia could refuse to permit the defendant, or anyone else, to transport alcoholic beverages into the state. It is difficult to see, then, how the regulatory system could be said to intrude to an unconstitutional degree into the defendant's right to enter into contracts.

■ Finally, Julius Wile urges that the regulatory program is void under the state constitutional provision, Ga.Code Ann. § 2–1409, which prohibits contracts which "defeat or lessen competition, or . . . encourage monopoly" and further states that "[t]he General Assembly . . . shall have no power to authorize any such contract or agreement."

The plaintiff cites a very old Georgia case, *Plumb v. Christie*, 103 Ga. 686, 695–96, 30 S.E. 759, 763 (1898), which held that, while the legislature normally could not create a monopoly, "when the State bestows a privilege which is not a common natural right, such as the right to engage in liquor traffic, it may create a monopoly, and yet no right of the individual be violated."

No modern Georgia case indicates that the state courts would not still uphold this principle. The Georgia Supreme Court recently said that, in areas affecting the public health and welfare, exclusive privileges can be created and restrictions on competition imposed. *Thompson v. Municipal Electric Authority of Georgia*, 238 Ga. 19, 25, 231 S.E.2d 720 (1976); *City of Calhoun v. North Georgia Elec. Membership Corp.*, 233 Ga. 759, 767–68, 213 S.E.2d 596 (1975). While those cases dealt with the power of the legislature to regulate the electric utility industry, their holdings apply equally to the legislative control over the liquor industry, which is at least as important an area of concern as utility regulation.

■ The complaint[3] appears to allege two separate grounds for interference with its alleged contractual relationship with North Coast. First, the plaintiff contends that the defendant maliciously induced North Coast to breach its alleged agreement with the plaintiff and to enter into a contract with the defendant which appointed the defendant as North Coast's exclusive agent in Georgia. (Plaintiff's Complaint, ¶ 5). Second, the plaintiff alleges that the defendant wrongfully prevented the plaintiff from obtaining any of North Coast's wine products since the inception of the agreement between North Coast and the defendant. (Plaintiff's Complaint, ¶ 6). The plaintiff moves for summary judgment, insisting that the defendant's failure to exhaust other available remedies is a bar to the counterclaim and that it has an exclusive right, established by the Revenue Rul-

3. The defendant maintains that the plaintiff is precluded by the doctrine of res judicata from instituting this action. Its reasoning is based on a statement in the Revenue Ruling that if North Coast wanted to market its wines in Georgia it must either institute and be granted a change in wholesalers, or market through Allstate, "or elect the final alternative which is to choose not to market its product within this state." (Revenue Ruling, at 11). The quoted passage, says the defendant, establishes that Allstate does not have any "right" to distribute North Coast's wines and, thus, cannot bring a suit based on interference with contractual relationships. This argument is without merit. Even assuming that Revenue Ruling would have any res judicata effect on these proceedings, the Revenue Department clearly meant only that North Coast could not import its wines into the state other than through Allstate, and if it did not choose to deal with Allstate, it could not bring its wines into the state at all.

ing, to distribute North Coast's wine products which the defendant has ignored. The former contention has been dealt with previously and the reasons for its rejection will not be repeated. As for the latter, the plaintiff failed to file an undisputed statement of facts in accordance with Rule 91.72, and, even if that were not true, its legal position on this point is based entirely on an incomplete statement of the law and the citation of one case. Moreover, to the extent the plaintiff is arguing that the Revenue Ruling established any contractual right to an exclusive distributorship in Georgia, it is mistaken. The Revenue Ruling clearly was limited to a decision that North Coast had designated the plaintiff as its exclusive distributor in Georgia, which designation could not be changed except for cause. Furthermore, the Revenue Department specifically refused to order North Coast or Julius Wile to deal with the plaintiff, thus evidencing its conviction that it was without authority to inquire into the contractual relations among the parties and issue orders based thereon. (Revenue Ruling, at 11). The plaintiff fails to demonstrate why it would be entitled to summary judgment on its complaint, and its motion is denied.

The defendant's motion for summary judgment asserts that the uncontroverted facts reveal that the plaintiff fails to meet several of the requirements for a cause of action based on tortious interference with contractual relationships.

■ The defendant states that, at the time of its entering into an agreement with North Coast, North Coast did not inform the defendant that it had sold its wines to the plaintiff, and that it was not until after the execution of the contract that the defendant became aware that the plaintiff previously purchased North Coast's wine. ("Julius Wile's Statement of Undisputed Facts Pursuant to Local Rule 91.72," ¶ 5, hereinafter referred to as the "Defendant's Facts"). This allegation is supported by the

affidavits of both the defendant's president and North Coast's president. (Affidavit of Neil L. Bianchini, ¶ 5, Affidavit of Lee Chandler, ¶ 5). The plaintiff does not dispute this fact. (Objection to the Defendant's Statement of Undisputed Facts, ¶ 5, hereinafter referred to as the "Plaintiff's Objection"). The court, then, is bound by the statement that the defendant did not know, prior to entering into the agreement, of any prior sales by North Coast to the plaintiff.

■ The Georgia Court of Appeals ruled that "[i]nterference with contractual relations is an *intentional* tort, and if intentional interference is to be required, it presupposes knowledge of the plaintiff's interests or, at least, of facts that would lead a reasonable man to believe in their existence." *Piedmont Cotton Mills, Inc. v. H. W. Ivey Const. Co.*, 109 Ga.App. 876, 880, 137 S.E.2d 528, 531 (1964) (emphasis in original). Accord, *Morse v. Piedmont Hotel Co.*, 110 Ga.App. 509, 510–11, 139 S.E.2d 133 (1964). Because it has been established that the defendant had no prior knowledge of any relationship between the plaintiff and North Coast, the plaintiff cannot make out a claim for interference with contractual relationships based on the defendant's purported inducement to North Coast to breach its relationship with the plaintiff and enter into an agreement with the defendant.[4]

■ The Georgia courts have also held that, where the defendant shows it had an absolute right to do the act complained of, it has defense to a tort claim. *Schaeffer v. King*, 223 Ga. 468, 155 S.E.2d 815 (1967); *Rebel Sales Co. v. McDuffie & Assoc., Inc.*, 142 Ga.App. 693, 237 S.E.2d 6 (1977); *Campbell v. Carroll*, 121 Ga.App. 497, 497–500, 174 S.E.2d 375, aff'd 226 Ga. 700, 177 S.E.2d 83 (1970). The defendant states that the contract between it and North Coast established the defendant as the *exclusive* United States distributor for North Coast's wines, giving the defendant control over distribution and sales and power to desig-

---

4. The defendant is insulated from liability even after the agreement was made, up until the time the defendant learned of the alleged con-

tract between the plaintiff and North Coast. Its liability following that date is discussed infra.

nate new wholesalers and to terminate distribution to any existing wholesaler (Defendant's Facts, ¶¶ 2, 4). North Coast also agreed to make no direct sales to any distributor other than the defendant. (Defendant's Facts, ¶ 3). Support for the defendant's assertions is found in the affidavits of Neil Bianchini (at ¶¶ 3, 4) and Lee Chandler (at ¶¶ 2, 3, 4). The plaintiff disputes these statements, arguing, *inter alia,* that the agreement between the defendant and North Coast speaks for itself. (Plaintiff's Opposition, ¶ 3).

If it is true that the defendant has the exclusive right to distribute North Coast's wines, and the authority to decide to whom they will be distributed, then the defendant is not liable for interference with the plaintiff's contractual relationship. The defendant, in effect, would be acting for North Coast, and it is conceptually impossible for the defendant to tortiously interfere with North Coast's relationship with the plaintiff. However, the contract between the parties should speak for itself. A ruling on this issue, therefore, must be deferred until the defendant furnishes the court with a copy of all agreements in effect from the time of the original grant to the defendant of distribution rights to date.

█ Another barrier to the plaintiff's recovery under Georgia law would be the absence of a contract between the plaintiff and North Coast. *Charles v. Simmons,* 215 Ga. 794, 797, 113 S.E.2d 604 (1960); *Studdard v. Evans,* 108 Ga.App. 819, 822–23, 135 S.E.2d 60 (1964). The plaintiff insists that there was such a contract, (Plaintiff's Objections, ¶ 6; affidavit of R. L. Randolph, Jr., ¶ 2), while the defendant vigorously denies that assertion (Defendant's Facts, ¶ 6; Affidavit of Neil Bianchini, ¶ 6; Affidavit of Lee Chandler ¶ 6). The failure to show such a contract existed could provide an alternate ground for resolution of this dispute.

Accordingly, Allstate's motion for summary judgment is denied. Julius Wile's motion for summary judgment for interference with Allstate's contractual relationships *before* it learned of the business dealings between North Coast and Allstate is granted. A decision will be deferred on the issue of Julius Wile's liability for interference with Allstate's contractual relationships *after* it discovered the existence of business dealings between Allstate and North Coast until Allstate and Julius Wile submit evidence in accordance with the terms of this order. The plaintiff and defendant are directed to furnish such evidence within ten (10) days from the date of the order, at which time the clerk shall submit Julius Wile's motion for summary judgment. The motion of the State Revenue Commissioner for summary judgment on Julius Wile's counterclaim for a declaratory judgment is granted, and Julius Wile's motion for judgment on the pleadings is denied.

So ordered this the 30th day of March, 1979.