**CAROLINA FURNITURE COMPANY, INC., Plaintiff,**

v.

**RHODES, INC. and Kincaid Furniture Company, Incorporated, Defendants.**

**Civ. A. No. CV181–158.**

United States District Court, S.D. Georgia, Augusta Division.

Nov. 19, 1984.

J. Patrick Claiborne, William J. Cooney, H. William Sams, Jr., Augusta, Ga., for plaintiff.

John A. Chandler and James R. McGibbon, David E. Hudson, Augusta, Ga., John M. Murchison, Jr., Charlotte, N.C., for defendants.

## ORDER ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

BOWEN, District Judge.

Plaintiff Carolina Furniture Company, Inc. (hereinafter "Carolina") owns and operates a retail furniture store in Augusta, Georgia. Defendant Rhodes, Inc. (hereinafter "Rhodes") owns and operates a number of retail furniture stores, including one store located in Augusta, Georgia. Defendant Kincaid Furniture Company, Incorporated (hereinafter "Kincaid") is a manufacturer of furniture with its principal place of business in Hudson, North Carolina.

Plaintiff's complaint is composed of three counts. In Count I, plaintiff alleges that the defendants conspired with each other and with other Kincaid distributors to restrain trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1). Counts II and III relate only to defendant Rhodes. In Count II, plaintiff alleges that defendant Rhodes, knowingly and maliciously and with intent to injure the plaintiff, interfered with plaintiff's contract to purchase the Kincaid line of furniture from defendant Kincaid and from other Kincaid distributors. In Count III plaintiff alleges that Rhodes engaged in a deceptive trade practice in violation of the Georgia Uniform Deceptive Trade Practices Act (Ga.Code Ann. § 10–1–372(a)(8)), when, in the course of its business, it disparaged the goods, services, and business of plaintiff by false and misleading representations of fact. Both defendants to this action have filed motions for summary judgment that are ripe for adjudication.

Before reaching the merits of the defendants' motions, the limited scope of this Court's inquiry must be clearly defined. Summary judgment may only be entered if it is apparent that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P.

The party seeking summary judgment bears the exacting burden of demonstrating that there is no actual dispute as to any material fact in the case. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Environmental Defense Fund v. Marsh*, 651 F.2d 983, at 990–91 (5th Cir.1981). In assessing whether the movant has met this burden, the courts should view the evidence introduced and all factual inferences from that evidence in the light most favorable to the party opposing the motion. *Id.* All reasonable doubts about the facts should be resolved in favor of the non-moving litigant. *Casey Enterprises v. American Hardware Mutual Insurance Co.*, 655 F.2d [598] at 602 [ (5th Cir.1981) ]. A court must not decide any factual issues it finds in the record, but if such are present, the court must deny the motion and proceed to trial. *Environmental Defense Fund v. March*, 651 F.2d at 991; *Lighting Fixture & Electric Supply Co. v. Continental Insurance Co.*, 420 F.2d 1211, 1213 (5th Cir.1969). Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from these facts. *Id.* If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment. *Croley v. Matson Navigation Co.*, 434 F.2d 73, 75 (5th Cir.1970); *Marsden v. Patane*, 380 F.2d 489, 491 (5th Cir.1967).

*Impossible Electronics Techniques, Inc. v. Wackenhut Protective System, Inc.*, 669 F.2d 1026, 1031 (5th Cir. Unit B 1982).

Although summary judgment is not inapplicable to antitrust cases, the Supreme Court has noted that

> summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot. It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised.

*Poller v. Columbia Broadcasting System,* 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962). In light of the governing standards as set forth above and having acknowledged "that summary judgment is extreme relief which should be approached very cautiously," *Parsons v. Ford Motor Co.,* 669 F.2d 308, 312 (5th Cir.1982), I will now address the defendants' motions.

### FINDINGS OF FACT

Based on the defendants' statements of undisputed material facts and the plaintiff's responses thereto, the following facts emerge as undisputed:

1. Plaintiff Carolina bought furniture manufactured by Kincaid directly from Kincaid for a period beginning in the summer of 1979 and ending in the spring of 1980.

2. Carolina's furniture store is located in Augusta, Georgia. A furniture showroom owned and operated by defendant Rhodes is also located in Augusta, Georgia.

3. Pretermitting the issue of whether Kincaid had, prior to the time that Carolina began to buy Kincaid furniture directly from Kincaid, made a commitment to sell certain groups of its furniture to Rhodes on an exclusive or semi-exclusive basis, Rhodes believed that Kincaid sold to Carolina furniture in the furniture groups promised to Rhodes on an exclusive or semi-exclusive basis.

4. At the time Carolina was a direct customer of Kincaid, Carolina always purchased furniture from Kincaid and paid by check, and always sought and received delivery of the furniture it bought at Kincaid's factory in Hudson, North Carolina.

5. Although Carolina's credit rating was modified as of May 18, 1981, at all times relevant to this suit, Carolina's credit rating with Lyons—an independent credit reporting publication widely used in the furniture industry—was a 13–9 rating. Under the Lyons' system, "13" means "inquire for report," and "9" means "claims to buy always for cash."

6. Carolina operated its business out of a metal, prefabricated building with few windows, no display windows and cement floors.

7. Carolina did not, during the period it was a direct customer of Kincaid, and at all other times material and relevant herein, display Kincaid furniture in room-like settings with appropriate accessories.

8. Immediately prior to the time he ordered that further direct sales of Kincaid furniture from Kincaid's factory to Carolina cease, Steve Kincaid, Kincaid's Executive Vice-President, viewed a number of pictures of the exterior and interior of Carolina's Augusta furniture store.

9. When it takes on a new customer, Kincaid prefers that that customer be a leading retailer in its (the putative customer's) marketing area, that is, the customer should be able and willing to advertise, display and adequately stock Kincaid furniture.

10. At all times relevant and material herein, Rhodes has had no contact whatsoever, with regard to Carolina, with any of the other Kincaid customers who have refused to sell Kincaid furniture to Carolina.

11. Carolina, Rhodes and the other Kincaid customers that Carolina alleges will not sell Kincaid furniture to it as

a result of pressure from Kincaid are sellers and not manufacturers of furniture.

12. Following Kincaid's refusal to sell Kincaid furniture to Carolina, Carolina has not gone out of business.

13. Following Kincaid's refusal to sell Kincaid furniture to Carolina, Carolina has substituted other lines of furniture in place of Kincaid's furniture. Moreover, Carolina still has some access to Kincaid furniture.

14. Plaintiff Carolina was not obligated to purchase any furniture from defendant Kincaid, nor was Kincaid obligated to supply any furniture to plaintiff, and plaintiff's sole relationship with defendant Kincaid was to purchase furniture on an "as-ordered" basis.

15. Rhodes had no knowledge of any alleged contractual relationship between plaintiff and defendant Kincaid.

16. No allegedly disparaging statements made by any Rhodes employee were put into writing.

17. No Rhodes officials directed or authorized any disparaging remarks by any of Rhodes' sales employees or other employees.

An examination of the record indicates that one further fact is not legitimately in dispute. Although plaintiff Carolina asserts in its response to Kincaid's statement of undisputed material facts that a genuine issue of fact exists as to whether Kincaid and Rhodes entered into their agreement, whatever the substance of that agreement might have been, prior to the time that Carolina began to buy Kincaid furniture directly from Kincaid in July of 1979, it appears that plaintiff's assertion is founded on an error made by Rhodes in an interrogatory answer. That error has been corrected, and plaintiff has cited no independent facts to suggest than an understanding under which Rhodes was to buy Kincaid furniture was not entered into prior to the time that Carolina began to buy Kincaid furniture directly from Kincaid. (*See* Deposition of George Alden Thornton, III, at 45–46; Rhodes' Supplemental Response to Plaintiff's Second Interrogatory No. 3.)

## CONCLUSIONS OF LAW

### A. PLAINTIFF'S ANTITRUST CLAIM

In its brief in opposition to the defendants' motions for summary judgment, the plaintiff characterizes its antitrust claim:

Plaintiff's action is based on the theory that the concerted refusal of Kincaid and certain other North Carolina wholesalers to sell to plaintiff, as a result of pressure from defendant Rhodes is a group boycott and constitutes a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. It is a horizontal restraint for businessmen on the same distribution level to conspire to refuse to sell to a particular customer.

Thus, plaintiff argues that the "rule of reason" standard articulated in *Standard Oil Co. v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911) is inapplicable to the present case. Plaintiff asserts that the defendants' conduct in this case falls into the exception to the rule of reason which mandates *per se* treatment for "[a]greements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use." *Northern Pacific Railway v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Plaintiff asserts that group boycotts have typically been among those categories of conduct deemed unreasonable *per se. See United States v. General Motors Corp.,* 384 U.S. 127, 145–146, 86 S.Ct. 1321, 1330–1331, 16 L.Ed.2d 415 (1966).

■ In analyzing plaintiff's argument, it should be noted that " 'there is more confusion about the scope and operation of the *per se* rule against group boycotts than in reference to any other aspect of the *per se* doctrine.' L. Sullivan, Antitrust 229–230 (1977)." *United States v. Realty Multi-List, Inc.,* 629 F.2d 1351, 1366 (5th Cir. 1980); *see* R. Bork, The Antitrust Paradox

330 (1978). In order to navigate through this confusion without adding to it, constant reference to the policy underlying the utilization of a *per se* rule of liability must be maintained. Caution must be taken "to determine whether conduct whose apparent purposes, standing alone, might warrant *per se* treatment are reasonably connected to an integration of productive activities or other efficiency—creating activity in such a manner as to require an inquiry into the net competitive effect under the rule of reason." *United States v. Realty Multi-List, Inc.,* 629 F.2d 1351, 1367 (5th Cir. 1980). In other words, "[w]hile the boycott concept is infinitely expandable, the *per se* doctrine ought not to be." Sullivan, Antitrust 256 (1977), quoted in *Oreck Corp. v. Whirlpool Corp.,* 579 F.2d 126, 131 (2d Cir.) (*en banc*), *cert. denied* 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978).

■ In determining whether to apply a *per se* test under the facts of this case, the first step is to determine whether the boycott alleged is "horizontal," a restraint originating between competitors at the same level of market structure, or vertical, a restraint originating between entities at different levels such as manufacturers and distributors.

The reason for focusing on the source of restraints on distributors is economic. Distributors have an incentive to agree among themselves to restrict competition, such as by allocating territories, in order to raise the price they receive for their product because to do so normally increases their profits. Such a horizontal conspiracy, which generates simply an increase in prices, is generally detrimental to consumers and is illegal per se.

Not only does a horizontal conspiracy among distributors hurt consumers, however; it injures the manufacturer as well because the higher retail price of the product reduces the quantity sold at retail and hence the quantity demanded from the manufacturer. A manufacturer generally prefers that its distributors sell its product for as low a price as possible, given the price at which it sells the product to them, i.e., for as small a markup as possible over the wholesale price, because its sales of the products are normally greater the lower the retail price. *See Continental T.V. [Inc. v. GTE Sylvania, Inc.],* 433 U.S. [36] at 56 & n. 24, 97 S.Ct. [2549] at 2560 & n. 24 [53 L.Ed.2d 568 (1977)]. A manufacturer thus will typically encourage intrabrand competition in order to enhance interbrand competition, i.e., the competitiveness of its product with those of other manufacturers. Sometimes, however, a manufacturer will find it advantageous to impose restrictions, such as assigned territories, on its distributors in order to induce them to undertake advertising or promotional activities, to render more or better services to customers, or simply to push the product more vigorously. By facilitating such efforts on the part of distributors, the restrictions tend to increase retail sales of the product, and may do so on balance even if they also generate some increase in the price the distributors charge. Thus, restrictions on intrabrand competition are sometimes a means whereby a manufacturer can increase interbrand competition. Because increasing interbrand competition is generally socially desirable and because intrabrand restrictions are generally not socially harmful when there is significant interbrand competition, manufacturer-imposed, i.e., vertical, restraints are governed by the rule of reason.

*Red Diamond Supply, Inc. v. Liquid Carbonic Corp.,* 637 F.2d 1001, 1004 n. 4 (5th Cir.), *cert. denied,* 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981).

■ The fact that Kincaid may distribute some of its own goods does not make it a competitor of Carolina and therefore render Kincaid's conduct horizontal.

When a producer elects to market its goods through distributors, the latter are not, in an economic sense, competitors of the producer even though the producer also markets some of its goods itself; rather, the distributors are "agents" of the producer, employed because the pro-

ducer has determined that it can supply its goods to consumers more efficiently by using distributors than it can by marketing them entirely by itself.

*Id.* at 1005.

On the surface, therefore, it appears that vertical and not horizontal conduct is involved in this case.[1] Plaintiff, however, relies upon *Cernuto v. United Cabinet Corp.*, 595 F.2d 164 (3rd Cir.1979) to allege that this case should be treated as a horizontal restraint in that it involves "the vertical expression of a horizontal desire." *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 678 F.2d 742, 744 (7th Cir.1982). Although it is undisputed that Rhodes did not directly contact any of the Kincaid customers who have allegedly refused to sell Kincaid furniture to Carolina, plaintiff contends that Kincaid forced those customers to refuse to deal with Carolina at the behest of Rhodes.

As Judge Posner recognized in *Valley Liquors,* there is

a certain unreality in the careful parsing of motives that *Cernuto* seems to require. If a supplier wants his distributors to emphasize nonprice rather than price competition, which as we said is the usual reason why he would restrict his distribution, he will be hostile to price cutters because they will make it harder for his other distributors to recoup the expenditures that he wants them to make on presale services to consumers and on other forms of nonprice competition, and of course the undersold distributors will be equally or more hostile. The motive of supplier and distributors alike could thus be described as wanting to eliminate

price cutters yet there would be no per se illegality so long as the supplier was not just knuckling under to the distributors' desire for less competition. It is difficult to see how a court could distinguish empirically between such a case and the pure antipathy to price competition envisaged by *Cernuto.*

*Id.*[2]

■ In this case, Kincaid had legitimate business reasons for terminating Carolina as its distributor. It is uncontested that Carolina operated its business out of a metal, prefabricated building with few windows, no display windows and cement floors. Carolina did not display Kincaid furniture in accessorized settings. Thus, it is clear that Carolina was not taking steps to emphasize nonprice competition in compliance with Kincaid's marketing policy of utilizing distributors that were able and willing to advertise, display and adequately stock Kincaid furniture.

While the facts may be disputed as to some of the motivations of Kincaid's management, it would be impossible to find that Kincaid was motivated solely by impermissible considerations. *See Cernuto,* 595 F.2d at 170. Under the facts present in this case, I conclude that the conduct alleged is not clearly a "naked restraint of trade." *E.A. McQuade Tours v. Consolidated Air Tour Manual Committee,* 467 F.2d 178, 187 (5th Cir.1972), *cert. denied,* 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973). Accordingly, I conclude that rule of reason as opposed to a *per se* rule of liability must be applied to the facts of this case.

---

1. Plaintiff's reliance upon *United States v. General Motors Corp.*, 384 U.S. 127, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966) and *Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) is, therefore, misplaced. Those cases involved "illegal horizontal combinations, not permissible vertical impositions." *Sports Center, Inc. v. Riddell, Inc.*, 673 F.2d 786, 791 (5th Cir.1982). It is also significant in this case that plaintiff has not been denied access to other lines of furniture so as to have been effectively driven out of business. *See E.A. McQuade Tours, Inc. v. Consolidated Air Tour Manual Committee,* 467 F.2d 178, 186–87 (5th Cir.1972),

*cert. denied* 409 U.S. 1109, 93 S.Ct. 912, 34 L.Ed.2d 690 (1973).

2. Plaintiff's repeated reference to a Rhodes inter-office memorandum in which it is noted that "Carolina Freight is 'cleaning our clock' on Kincaid case pieces" can best be understood in light of this economic reasoning. Complaints about price do not necessarily suggest illicit price fixing. Such complaints may instead suggest that a particular distributor is emphasizing price over non-price competition contrary to the manufacturer's chosen distribution scheme.

Under a rule of reason analysis, the plaintiff must show "that the restriction [it] is complaining about was unreasonable because, weighing effects on both intrabrand and interbrand competition, it made consumers worse off." *Valley Liquor, Inc.*, 678 F.2d at 745. In order to carry its burden, the plaintiff must prove that Kincaid has substantial market power in some relevant market based on a market share analysis. *Muenster Butane, Inc. v. Stewart Co.*, 651 F.2d 292, 298 (5th Cir.1981); *Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001, 1005–06 (5th Cir.), *cert. denied*, 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 (1981). As Judge Posner has explained,

> [a] firm that has no market power is unlikely to adopt policies that disserve its consumers; it cannot afford to. And if it blunders and does adopt such a policy, market retribution will be swift. Thus its mistakes do not seriously threaten consumer welfare, which is the objective that we are told should guide us in interpreting the Sherman Act.

*Valley Liquors*, 678 F.2d at 745.

In this case, it is undisputed that Carolina has substituted other lines of furniture in place of Kincaid's furniture and that Carolina still has some access to Kincaid furniture. Exhibit 1 to Kincaid's statement of undisputed material facts indicates the number of furniture lines carried by Carolina.

In response to these facts Carolina asserts that it has been unable to find a substitute which has the distinct quality and price of Kincaid furniture. In effect, Carolina is asserting that interbrand competition does not act as a "significant check on the exploitation of intrabrand market power" in the relevant furniture market. *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 53 n. 19, 97 S.Ct. 2549, 2559 n. 19, 53 L.Ed.2d 568 (1977). This bald assertion is not sufficient to avoid summary judgment in light of the evidence presented by Kincaid of the number of different lines of furniture being sold in the Augusta furniture market. Plaintiff

has presented no evidence to support its claim that Kincaid furniture is insulated from interbrand competition. *See Mendelovitz v. Adolph Coors Company*, 693 F.2d 570, 576 (5th Cir.1982). Plaintiff, thus, has made no showing that Kincaid has substantial market power in any relevant market and cannot prevail under a rule of reason analysis.

Accordingly, the defendants' motions for summary judgment as to plaintiff's antitrust claim are hereby GRANTED.

## B. TORTIOUS INTERFERENCE WITH CONTRACTUAL OR BUSINESS RELATIONSHIP

Having ruled on plaintiff's antitrust claim, only issues of state law remain. Since substantial time and energy has been expended on discovery and briefing regarding these issues, I choose to proceed with these pendent claims and to rule on the merits of plaintiff's state law contentions. *Henson v. Columbus Bank and Trust Co.*, 651 F.2d 320, 325 (5th Cir.1981); *Pharo v. Smith*, 621 F.2d 656, 674–75 (5th Cir.1980).

Plaintiff alleges that Rhodes intentionally interfered with plaintiff's business relationship with defendant Kincaid and other North Carolina wholesalers resulting in damage to plaintiff's business income and profits. It is undisputed that Rhodes had no knowledge of any alleged contractual relationship between plaintiff and defendant Kincaid. Moreover, plaintiff concedes that it was not obligated to purchase any furniture from defendant Kincaid and that Kincaid was not obligated to supply any furniture to plaintiff. Significantly, it is uncontroverted that Rhodes had no contact whatsoever, regarding Carolina, with any of the other Kincaid customers who refused to sell Kincaid furniture to Carolina.

Without knowledge of the contractual relationship there can be no intentional interference with the relationship. *Allstate Beer, Inc. v. Julius Wile Sons & Co.*, 479 F.Supp. 605, 612 (N.D.Ga.1979). With no mutuality of obligation, there is no contract

with which to interfere. *Id.* at 613. Moreover, there is no evidence on this case of independently tortious conduct. *See NAACP v. Overstreet,* 221 Ga. 16, 142 S.E.2d 816 (1965), *cert. dismissed,* 384 U.S. 118, 86 S.Ct. 1306, 16 L.Ed.2d 409 (1966). Thus, I conclude that under the facts of this case there was no intentional interference with any actual contract in this case.

 Given the fact that there is no cause of action available to the plaintiff for tortious interference with any contractual right, plaintiff must look to the more general tort of malicious interference with business relations for relief. It is far from clear whether Georgia recognizes such a cause of action. *See* W. Welch and J. Ruff, *The Business Tort—Interference with Contractual Relationships or Business Expectations,* 19 Ga.State Bar Journal 66, 68 (1982). It is the federal decisions interpreting Georgia law, not the decisions of Georgia's own courts, that have extended protection to unilateral business expectations. *See Hayes v. Irwin,* 541 F.Supp. 397 (N.D.Ga.1982); *aff'd* 729 F.2d 1466 (1984); *Record Data, Inc. v. Preferred Research of Ga., Inc.,* No. 78–1339A (N.D.Ga.1979), *aff'd,* 633 F.2d 581 (5th Cir.1980). Absent some clearer signal from the Georgia courts, I am reluctant to grant relief under the facts of this case. I am not free under the *Erie* doctrine to create remedies that do not exist under state law. Accordingly, I conclude that plaintiff's attempt to fall back onto the tort of tortious interference with business relations must fail.

 Assuming arguendo that the courts of Georgia would recognize a cause of action for malicious interference with business relations under the facts of this case, I still must conclude that the plaintiff cannot prevail.

In establishing a cause of action for malicious interference with business relations, a plaintiff must demonstrate that the defendant (1) acted improperly and without privilege, (2) purposely and with malice with the intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with the plaintiff, and (4) for which the plaintiff suffered some financial injury. *Record Data, Inc. v. Preferred Research of Georgia, Inc.,* Civil Action No. C78–1339 (N.D.Ga. Feb. 14, 1979) (Freeman, J.), *aff'd,* 633 F.2d 581 (5th Cir. 1980). *Hayes v. Irwin,* 541 F.Supp. 397, 429 (N.D. Ga.1982).

It is undisputed that regardless of whether Rhodes actually had exclusive or semi-exclusive rights in the relevant furniture lines, Rhodes legitimately believed that Kincaid was selling to Carolina furniture groups promised to Rhodes on an exclusive or semi-exclusive basis. I conclude that this fact negates the necessary element of malice since Rhodes was entitled under the circumstances to question Kincaid's relationship with the plaintiff. *See Luke v. DuPree,* 158 Ga. 590, 124 S.E. 13 (1924); *Architectural Manufacturing Co. v. Airotec, Inc.,* 119 Ga.App. 245, 166 S.E.2d 744 (1969). Rhodes actions clearly were not taken with knowledge that the plaintiff had a right to the furniture in question. *Hayes v. Irwin,* 541 F.Supp. 397, 429 (N.D.Ga.1982).

Accordingly, defendant Rhodes' motion for summary judgment as to Count II of plaintiff's complaint is hereby GRANTED.

## C. DISPARAGEMENT

 The plaintiff does not appear to seriously contest defendant Rhodes' motion as to Count III of its complaint. It is undisputed that no allegedly disparaging statements made by any Rhodes' employee were put into writing and that no Rhodes' officials directed or authorized any disparaging remarks by any of Rhodes' sales employees or other employees.

As a corporation the defendant "is not liable for damages resulting from the speaking of false, malicious, or defamatory words by one of its agents, even where in uttering such words the speaker was acting for the benefit of the corporation and within the scope of the duties of his agency, unless it affirmatively appears that the agent was ex-

pressly directed or authorized by the corporation to speak the words in question." *Behre v. National Cash Register Co.,* 100 Ga. 213(1) (27 SE 986). Accord, *Garren v. Southland Corp.,* 237 Ga. 484 (228 SE2d 870); *Ga. Power Co. v. Busbin,* 242 Ga. 612(4) (250 SE2d 442).

*Swift v. S.S. Kresge Co.,* 159 Ga.App. 571, 572, 284 S.E.2d 74 (1981).

Accordingly, defendant Rhodes motion for summary judgment as to Count III of plaintiff's complaint is hereby GRANTED.

### CONCLUSION

For the reasons outlined above, the plaintiff's antitrust claims contained in Count I of its complaint are without merit as a matter of law, and the defendants' motions for summary judgment as to these claims are therefore GRANTED. Plaintiff's remaining state claims contained in Counts II and III of plaintiff's complaint and heard under this Court's pendent jurisdiction are likewise without merit, and defendant's Rhodes motion for summary judgment as to those claims is also GRANTED. Having considered all claims raised by the plaintiff and having determined that the defendants are entitled to judgment as a matter of law, this case is hereby DISMISSED. The clerk shall enter judgment in favor of the defendants whose costs shall be taxed against the plaintiff.