Morris J. HUNTER, Plaintiff,

v.

CITIBANK, N.A., Defendant.

Nos. 90–CV–3816, 93–CV–1028.

United States District Court,
E.D. New York.

Sept. 15, 1994.

Morris J. Hunter, pro se.

Joseph Baumgarten, Proskauer Rose Goetz & Mendelsohn, New York City, for defendant.

## MEMORANDUM AND ORDER

SEYBERT, District Judge:

In the above-referenced actions, plaintiff, proceeding *pro se*, alleges, *inter alia*, that his former employer, Citibank, N.A., discriminated against him because of his race and religion. Plaintiff brought his first action against defendant in October 1990 (90–CV–3816) ("Hunter I") pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42

U.S.C. § 2000e *et seq.* ("Title VII"), alleging racial and religious discrimination. In May 1991, plaintiff filed an amended complaint that added several state common law causes of action arising out of the same allegedly discriminatory conduct underlying his initial complaint.[1] Defendant filed a summary judgment motion in Hunter I on December 31, 1991. Judge Weinstein denied the motion without opinion at a January 20, 1993 status conference. On March 11, 1993, plaintiff commenced a second action (93–CV–1028) ("Hunter II") pursuant to 42 U.S.C. § 1981 alleging racial discrimination based in part on the conduct complained of in Hunter I. Plaintiff's second action also included one new allegation: that a January 1993 outsourcing by defendant of certain tasks previously performed by plaintiff also constituted racial discrimination against him.

Defendant filed a motion on February 2, 1994 seeking reconsideration of Judge Weinstein's denial of defendant's motion for summary judgment in Hunter I and summary judgment on the claims filed in Hunter II. For the reasons stated below, the request for reconsideration is denied and the motion for summary judgment with respect to the Hunter II claims is granted.

## BACKGROUND

In June 1983, plaintiff, a Christian minister, was hired as a permanent full-time employee with Citibank at a yearly base salary rate of $11,000. (*Id.* at 12, 17.) In June 1988, plaintiff was transferred to defendant's Pelham facility, where his responsibilities included microfilming all of the booked consumer loan applications forwarded to the support services unit. (Hunter Dep., July 24, 1991, at 15; Durruthy Aff. ¶ 3.)

Plaintiff alleges that in the summer of 1988, he requested, but was denied, permission from his supervisors to conduct lunchtime Bible study classes. (Hearing Tr., Mar. 5, 1992, at 6.) Disregarding this instruction, plaintiff initiated the classes in August 1988 but voluntarily discontinued them after less than ten meetings. (Hunter Dep., July 24, 1991, at 146–149, 159.) It is uncontested that none of defendant's employees, including plaintiff's direct supervisor, Brenda Giangregorio, told plaintiff to cease holding the Bible study classes. (*Id.* at 159–60.)

Plaintiff claims that after his request to begin the Bible study classes, Giangregorio began to "harass me with my job, my work, the standards, the productivity." (*Id.* at 53; Hearing Tr., March 5, 1992, at 6.) Specifically, plaintiff alleges that he was harassed for not meeting what he considered to be a "very high standard" for microfilm data entry. (Amended Hunter I Compl. at 1.) Defendant argues that plaintiff was not harassed but merely criticized for producing substandard work and being tardy, argumentative and disruptive. (Mullins Dep., August 14, 1991, at 20, 39, 55.)

On December 13 and 27, 1988, plaintiff requested permission to take December 30, 1988 as a personal day. (Mem. in Response to Def. Mot. for Sum. Jgmt. in Hunter I, Exh. A at 5 and Exh. 1A at 1.) Plaintiff was denied permission because of his unit's work responsibilities [2] while another employee in the unit was granted the day off. (*Id.* at 4; Mullins Dep., Aug. 14, 1991, at 34.) Even though Giangregorio specifically told plaintiff to report to work on that day, plaintiff failed to do so. (Mem. in Response to Def. Mot. for Sum. Jgmt. in Hunter I, Exh. 12L at 2.) Plaintiff was penalized one day's pay as a result. (Hunter Dep., July 24, 1991, at 212.)

On January 12, 1989, Giangregorio, after consulting with her superiors, decided to place plaintiff on "final corrective action warning" ("final warning") pursuant to the Citibank's corrective action policy.[3] (*Id.* at

---

**1.** The Court is exercising ancillary jurisdiction over these related actions pursuant to 28 U.S.C. § 1367(a). 28 U.S.C.A. § 1367(a) (West 1993).

**2.** Under Citibank's *Working Together* handbook, a supervisor has the authority to deny a request for a personal day based on a unit's work requirements. (Durruthy Aff. ¶ 4, Ex. A; Mem. in Re-

sponse to Def. Mot. for Sum. Jgmt. in Hunter 1, Exh. 12L at 2.)

**3.** Citibank's corrective action policy is contained in the handbook *Working Together* that plaintiff indicated he received from defendant. (Hunter Dep. at 226.) In the event disciplinary action is required, the policy provides for the following steps to be taken, any of which may be bypassed

1.) The final warning was issued as a result of plaintiff's failure to report to work on December 30, 1988, substandard work performance and tardiness. (*Id.* at 2.) The warning was to remain in effect for six months and had the effect of rendering plaintiff ineligible for promotion, transfer or salary increase during that time. (Durruthy Aff. ¶ 5.)

Plaintiff used Citibank's internal problem review procedure to challenge the final warning. (Mem. in Response to Def. Mot. for Sum. Jgmt. in Hunter 1, Exh. 12L at 1.) Plaintiff wrote a five-page response to the warning. (Durruthy Aff. ¶ 9.) He then participated in three lengthy meetings, totaling fourteen hours, which resulted in a reduction of the final warning to a formal one-month written warning. (Mem. in Response to Def. Mot. for Sum. Jgmt. in Hunter I, Exh. 12L at 1; Hunter Dep., July 24, 1991, at 232.) In a letter submitted to the Equal Employment Opportunity Commission (the "EEOC") in connection with plaintiff's subsequent action before that agency, Citibank acknowledged that the final warning had been excessive in light of the fact that some of the complaints concerning plaintiff's tardiness, work performance and attitude had not been well-documented. (Mem. in Response to Def. Mot. for Sum. Jgmt. in Hunter 1, Exh. 12L at 2.) For instance, Giangregorio had noted in plaintiff's file that his work performance had been below average on days that were not business days. (Mullins Dep., Aug. 14, 1991 at 49.)

Plaintiff was again dissatisfied with the result and requested that his grievance be advanced to the next step of the problem review procedure. Pursuant to this request, plaintiff met with Richard Federman, a vice president at Citibank, who reduced the formal warning to an informal oral warning. This warning had no effect on eligibility for promotion, transfer or salary increases. (Hearing Tr., Mar. 5, 1992, at 8; Hunter Dep., July 24, 1991, at 253.) Indeed, plaintiff

received a salary increase and promotion in June 1989. (Durruthy Aff. ¶ 12.)

Plaintiff, still dissatisfied, filed a charge alleging racial and religious discrimination with the EEOC based on the foregoing facts. The EEOC requested that plaintiff accept an offer of settlement in which defendant would reimburse plaintiff for one day's pay. (Mem. in Response to Def. Mot. for Sum. Jgmt. in Hunter 1, Exh. 11K.) The EEOC concluded that this afforded plaintiff full relief, because the "warning in [his] file had expired."[4] (*Id.*) Plaintiff refused to accept the offer, and the EEOC dismissed his complaint for failure to accept an offer of full relief. (Amended Hunter I Compl., Exh. 2.) Plaintiff then commenced Hunter I.

Despite his dispute with defendant, plaintiff continued to receive annual salary increases in June of each year. He was earning $19,750 per annum by June 1991 and had been promoted from a grade six to a grade nine by June 1990.

In January 1993, Jay Moskowitz, the Citibank vice president responsible for plaintiff's unit, decided to outsource plaintiff's microfilming responsibilities to an independent contractor, Documentary Reproduction Service ("DRS"). Plaintiff continued to be responsible for his remaining duties and was also assigned to special projects within Citibank, such as pulling files, attaching correspondence to files and handling denied applications. (Hunter Dep., Nov. 29, 1993, at 41.) Defendant assert that the outsourcing saved between $12,000 to $16,000 annually and improved the quality of document reproduction. (Moskowitz Dep., Dec. 7, 1993, at 45.) Plaintiff suffered no break in service or loss of salary or benefits from the time of the outsourcing until November 1993, when Citibank moved its entire Pelham operation to Saint Louis, Missouri. (Hunter Dep., Nov. 29, 1993, at 42–43; Moskowitz Dep., Dec. 7, 1993, at 31.) Feeling humiliated and believing that the outsourcing of his microfilming responsibilities adversely affected his job se-

---

depending on the severity of the situation: informal oral warning, formal written warning, final written warning, suspension and termination. (Mem. in Response to Def. Mot. for Sum. Jgmt. in Hunter 1, Exh. 12L at 6–8; Durruthy Aff. ¶ 5.)

4. Plaintiff has objected to the fact that the warnings he had received continued to remain in his records, even though they were without effect. (Hearing Tr., March 5, 1992, at 9.)

curity, plaintiff filed Hunter II alleging a violation of 42 U.S.C. § 1981. (Hunter Dep., Nov. 29, 1993, at 43.)

## DISCUSSION

### I. *Hunter I*

■ The procedural history of Hunter I does not justify reconsideration of Judge Weinstein's order of January 20, 1993 denying defendant's motion for summary judgment in Hunter I. Under Federal Rule of Civil Procedure 60(b)(1) ("Rule 60(b)(1)"), a court may relieve a party from a final order on the basis of mistake, inadvertence, surprise or excusable neglect if the final order was entered within one year of the motion for reconsideration. Defendant's motion for reconsideration was made on February 2, 1994, more than one year after Judge Weinstein's order. Therefore, reconsideration cannot be granted on the basis of Rule 60(b)(1).

■ Reconsideration is also unavailable under Federal Rule of Civil Procedure 60(b)(6) ("Rule 60(b)(6)"), which allows for an order to be vacated on the basis of "any other reason justifying relief from the operation of the judgment." The only ground that defendant has offered for reconsidering the denial of summary judgment is that more recent Title VII cases, and in particular the Supreme Court's recent decision in *St. Mary's Honor Ctr. v. Hicks*, — U.S. —, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993), "make clear that, in order to survive summary judgment in a discrimination case, a plaintiff must present evidence from which a reasonable fact-finder could conclude that he was a victim of discrimination." (Def. Mem. in Support of Motion for Summ. Judg. and/or Recons. at 6.) Defendant thus argues that a clarification of existing law should be grounds for reconsideration. Even a change in decisional law, however, is not grounds for relief under Rule 60(b)(6). *Travelers Indem. Co. v. Sakisian*, 794 F.2d 754, 757 (2d Cir.), *cert. denied*, 479 U.S. 885, 107 S.Ct. 277, 93 L.Ed.2d 253 (1986). Moreover, a motion for

reconsideration under Rule 60(b)(6) must be made within a reasonable time. Fed. R.Civ.P. 60(b). Defendant waited over seven months after the decision in *Hicks* to file its request for reconsideration. A delay of such duration will not be considered by the Court to be reasonable. Defendant's motion for reconsideration is therefore denied.

### II. *Hunter II*

#### A. *Discrimination Claims Dating from 1988 and 1989*

■ Plaintiff's claims in Hunter II relating to defendant's alleged discriminatory conduct in 1988 and 1989 are not cognizable under 42 U.S.C. § 1981, as amended by the Civil Rights Act of 1991 (the "Act"). 42 U.S.C.A. § 1981 (West 1981 and Supp.1994). Section 101 of the Act expanded the prohibition in Section 1981 against racial discrimination in the making and enforcement of contracts to apply to "all phases and incidents of the contractual relationship, including discriminatory contract terminations."[5] *Rivers v. Roadway Exp., Inc.*, — U.S. —, —, 114 S.Ct. 1510, 1514, 128 L.Ed.2d 274 (1994). In *Rivers, id.*, the Supreme Court, however, declined to apply 42 U.S.C.A. § 1981(b) to conduct occurring prior to the date on which the Act became effective. *See also Butts v. City of New York Dep't of Hous. Preservation and Dev.*, 990 F.2d 1397, 1411 (2d Cir. 1993) (holding that Section 101 of the Act does not apply retroactively to cases not pending on appeal at the time the Act became effective). Thus, the amended provisions of Section 1981 are not applicable to plaintiff's claims arising in 1988 and 1989.

■ In order for plaintiff, therefore, to have stated a cause of action under Section 1981 with respect to his 1988 and 1989 claims, the claims must fall within the ambit of Section 1981 as in effect prior to its amendment in 1991 by the Act. Section 1981 prior to its amendment in 1991 covered only conduct occurring during the formation of an employee contract or which interferes with a

---

**5.** 42 U.S.C. 1981(b), which codified Section 101 of the Act, provides *inter alia* that "the term 'make and enforce contracts' includes the making, performance, modification, and termi-

nation of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C.A. 1981(b) (West Supp.1994).

party's right to enforce established contractual obligations. *Patterson v. McLean Credit Union*, 491 U.S. 164, 169–171 and 175–77, 109 S.Ct. 2363, 2369 and 2372, 105 L.Ed.2d 132 (1989). Section 1981 prior to its amendment in 1991 did not apply to a breach of contract terms or to the imposition of discriminatory working conditions after the contract relation between an employee and an employer has been established. *Id.* at 177–78, 109 S.Ct. at 2373.

■ Plaintiff's 1988 and 1989 claims do not relate to contract formation. Only where an employee is denied a promotion that rises to the level of an opportunity for a new and distinct relation between the employee and the employer is the claim actionable under Section 1981 prior to its amendment in 1991. *Id.* at 185, 109 S.Ct. at 2377. Plaintiff has not alleged that he was denied a promotion of any kind as a result of the outsourcing.

■ Nor does plaintiff allege that defendant obstructed the enforcement of his contract rights. The right to enforce contracts does not extend beyond conduct by an employer which impairs an employee's ability to enforce through legal process his or her established contract rights. *Id.* at 177–78, 109 S.Ct. at 2373. In the instant action, the defendant's conduct did not interfere with plaintiff's ability to adjudicate his dispute by judicial means. Nor were plaintiff's efforts to resolve the dispute by nonjudicial methods within Citibank obstructed. *See id.* (noting that obstruction of access to nonjudicial dispute resolution provided for by contract could violate the enforcement clause of Section 1981 prior to its amendment in 1991). In fact, Citibank's human resource generalist, Roseanne Durruthy, herself initiated Citibank's internal review procedure to address plaintiff's allegations. (Hunter Dep., July 24, 1991, at 229.) Plaintiff himself does not allege that Citibank obstructed his access to the problem review process. (Hunter Dep., July 24, 1991, at 232–235 (indicating that plaintiff considered Durruthy, the arbiter through most of the internal review procedure, to have been neutral).) Plaintiff simply did not like the outcome of the review process.

Since plaintiff's claims in Hunter II dating from 1988 and 1989 are not actionable under 42 U.S.C. § 1981, either in its present form or as in effect prior to its amendment in 1991, defendant is entitled to a judgment as a matter of law with respect to these claims. Fed.R.Civ.P. 56(c). Defendant's motion for summary judgment dismissing these claims is therefore granted.

B. *Discrimination Claim Arising in 1993*

Summary judgment is also appropriate with respect to plaintiff's claim that defendant's outsourcing in 1993 of its microfilming work was discriminatory and without a legitimate business purpose. A court may grant summary judgment when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). It is not the trial court's function to weigh the evidence and resolve the factual issues. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). A dispute as to a material fact is "genuine," and summary judgment is inappropriate, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Lang v. Retirement Living Pub. Co., Inc.*, 949 F.2d 576, 580 (2d Cir.1991) (quoting *Anderson*, 477 U.S. 242 at 248, 106 S.Ct. 2505 at 2510). Because granting the motion deprives the nonmoving party of its day in court, the district court in examining the record must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *Gallo v. Prudential Residential Services*, 22 F.3d 1219, 1223 (2d Cir.1994); *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir.1989).

The party moving for summary judgment bears the burden under Rule 56(c) of demonstrating the absence of any genuine issue of material fact. *See Consarc Corp. v. Marine Midland Bank, N.A.*, 996 F.2d 568, 572 (2d Cir.1993) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970)); *Gallo*, 22 F.3d at 1223. This burden may be met by demonstrating that little or no evidence supports the nonmoving party's claim. *Celotex Corp. v. Ca-*

*trett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986); *Gallo,* 22 F.3d at 1223. If there is little or no evidence to establish the existence of an element essential to the nonmoving party's case and on which the nonmoving party bears the burden of proof at trial, a genuine issue of material fact cannot exist. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2252.

▆▆▆▆ The elements required to establish discrimination under Title VII are applicable to actions under Section 1981. *See Patterson,* 491 U.S. at 186, 109 S.Ct. at 2377–78. In actions brought under Section 1981, therefore, the plaintiff bears the burden of initially proving by a preponderance of the evidence a prima facie case of discrimination. *Rosen v. Thornburgh,* 928 F.2d 528, 532 (2d Cir.1991) (citations omitted). The Supreme Court continues to apply the three part test for establishing a prima facie case enumerated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 801–05, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973). *Hicks,* —— U.S. at ——–——, 113 S.Ct. at 2746–47. Under this test, plaintiff must show: that he belongs to a racial minority; (2) that he is qualified to perform the position for his employer; (3) that, despite his qualifications, he was denied the position, discharged or subjected to some other form of adverse treatment; and (4) that the discharge occurred under circumstances that give rise to an inference of discrimination. *See Hicks,* —— U.S. at ——, 113 S.Ct. at 2747 (citing *McDonnell,* 411 U.S. at 806, 93 S.Ct. at 1824–25); *McDonnell,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13 (implying that because the facts will vary in discrimination cases, the components of the prima facie case to be proved will also vary); *Medwid v. Baker,* 752 F.Supp. 125, 136 (S.D.N.Y.1990) (noting in the age discrimination context that in order to meet the third prong required to establish a prima facie case, a plaintiff must demonstrate that he suffered a material adverse change in the terms or conditions of his employment); *Monaco v. Fuddruckers Inc.,* 1 F.3d 658, 660 (7th Cir.1992) (also noting in the age discrimination context the same material adverse change requirement for establishing a prima facie case).

▆▆▆▆ Once a prima facie case is established, a rebuttable presumption of discrimination arises. *Hicks,* —— U.S. at ——, 113 S.Ct. at 2747. The defendant then has the burden of producing evidence "which *taken as true,* would *permit* the conclusion that there was a nondiscriminatory reason for the adverse action." *Hicks,* —— U.S. at ——, 113 S.Ct. at 2748 (emphasis in original). Upon such a showing, the burden shifts back to the plaintiff to demonstrate, by direct, statistical or circumstantial evidence, both that the employer's explanation was a mere pretext and that the underlying reason for adverse action was discrimination. *Id.* at ——, ——–——, 113 S.Ct. at 2747, 2753–54; *Gallo,* 22 F.3d at 1225 (citations omitted); *Saulpaugh v. Monroe Community Hosp.,* 4 F.3d 134, 142 (2d Cir.1993).

▆▆▆▆ After viewing the evidence before the Court in the light most favorable to plaintiff, the Court finds that plaintiff has failed to present a prima facie case of discrimination. Although plaintiff is a member of a racial minority and was qualified for the position he held, plaintiff has not provided evidence establishing the third element of the *McDonnell* test. Plaintiff has not shown any material adverse effect resulting from Citibank's outsourcing of his microfilming responsibilities. He states merely that he felt embarrassed and humiliated by the fact that the work was outsourced. (Hunter Dep., Nov. 29, 1993, at 43–44.) Although he also asserts that he feared for his job "for the first couple of months" following Citibank's decision, (*id.* at 44–45), he acknowledges that no one ever told him that he would be discharged because of the outsourcing. (*Id.* at 44–45.) In fact, plaintiff was not fired or demoted. (*Id.* at 42.) He continued to work with Citibank until Citibank transferred the entire Pelham facility to St. Louis, Missouri. Plaintiff does not allege that his promotion and salary were affected. (Moskowitz Dep., December 7, 1993 at 19.) Nor does he claim that he was assigned more onerous tasks. Plaintiff does not even assert that any Citibank employee treated him in a negative manner as a result of the outsourcing. (*Id.* at 43.) Plaintiff's personal feelings cannot, without some grounding in fact, be a suffi-

cient basis for finding that defendant's actions materially and adversely affected plaintiff.

Even if plaintiff had satisfied the requirements for establishing a prima facie case, defendant would be entitled to summary judgment. To rebut plaintiff's prima facie case, Citibank presented the deposition of one of its vice presidents, Jay Moskowitz, stating that the outsourcing stemmed from an effort by Citibank to save money and obtain better quality microfilm productions. (Moskowitz Dep., Dec. 7, 1993 at 45.) Moskowitz further stated that Citibank's expectations as to the benefits of the outsourcing were realized. (*Id.* at 19.) Moskowitz noted that Citibank's outsourcing was to some degree necessitated by plaintiff's "erratic" productivity.[6] (*Id.* at 17.) Moskowitz admitted that the company to which the microfilming was outsourced did not have to meet the standards that had been imposed on plaintiff. Moskowitz noted, however, that such companies typically are judged by the timeliness and quality of their work. (*Id.* at 30.) Moreover, because their compensation increases with each item microfilmed, such companies have an incentive to work as productively as possible. (*Id.* at 45.) Moskowitz also indicated that Citibank's microfilming volume was starting to dwindle and it was not longer cost-effective to have a full-time microfilming clerk. (*Id.* at 36.) By offering this evidence, defendant satisfied its obligation to produce proof of a nondiscriminatory reason for the outsourcing.

In view of this defense, plaintiff was required to show that a genuine material issue for trial exists as to whether Citibank's reasons for the outsourcing constituted a mere pretext for race discrimination. Plaintiff, however, simply states in a conclusory fashion that the outsourcing was not a reasonable business decision. Plaintiff also implies that defendant's explanation was a pretext for discrimination because Citibank did not have a stated policy explicitly permitting outsourcing. The Court does not understand the logic of this argument and agrees with defendant that so long as no policy prohibited outsourcing, defendant was free to distribute the microfilming work to an outside contractor.

Plaintiff attempts to raise a genuine issue for trial by asserting that Moscowitz is Jewish and the company to which the microfilming work was given was Jewish-owned. (Hunter II Compl. at 2.) Plaintiff's Section 1981 claim, however, is based solely on racial discrimination. In an action involving racial discrimination, such an assertion does not raise a genuine and material issue for trial.[7] Because plaintiff has presented no other evidence that defendant was motivated by *racial* discrimination in outsourcing the microfilming work, defendant's motion for summary judgment with respect to this claim must be granted.

### CONCLUSION

Based on the foregoing, the Court denies defendant's motion for reconsideration of the order refusing to grant summary judgment on the Hunter I causes of action, and grants defendant's motion for summary judgment on the Hunter II causes of action. Plaintiff's claims in Hunter II are hereby dismissed with prejudice.

SO ORDERED.

---

6. Plaintiff admits that he microfilmed documents that he was explicitly instructed not to copy. (Hunter Dep., July 24, 1993, at 291–293.)

7. The Court questions whether such an assertion alone would be sufficient to raise a genuine issue for trial even in a case involving religious discrimination.