The POLOTE CORPORATION, Plaintiff,

v.

METRIC CONSTRUCTORS,
INC., Defendant.

Civ. A. No. CV494–051.

United States District Court,
S.D. Georgia,
Savannah Division.

Jan. 25, 1995.

Ronald G. Robey, Hubert J. Bell, Jr., Smith, Currie & Hancock, Atlanta, GA, for plaintiff Polote Corp..

Victoria Soto Tobin, David R. Hendrick, Hendrick, Spanos & Phillips, Atlanta, GA, for defendant Metric Constructors, Inc.

## *ORDER*

EDENFIELD, Chief Judge.

Before the Court is Defendant's motion for partial summary judgment on Counts I and III of the Complaint. Count I alleges Defendant engaged in several instances of racial discrimination against the Plaintiff that are actionable under 42 U.S.C. § 1981. Count III alleges Defendant tortiously interfered with Plaintiff's existing and potential contractual relationships with third parties. Because genuine issues of material fact exist as to some, but not all of Plaintiff's claims, the Court **DENIES** the Defendant's motion for summary judgment in part and **GRANTS** it in part.

## I. BACKGROUND

The Plaintiff and Defendant are not strangers to one another. Plaintiff, the Polote Corporation ("Polote"), a minority owned Georgia construction company, has served in a subcontractor or 25 percent joint venture capacity with the Defendant, Metric Constructors, Inc. ("Metric"), a North Carolina construction company, on four major construction projects. By working with Polote on these projects, Metric was attempting to foster a long-term relationship between the two companies. One that would ensure Metric always had a reliable minority subcontractor available when it bid on contracts having minority participation requirements.

The companies appeared to have a strong working relationship until the very close of their most recent joint endeavor, the Santee Cooper–Cross Generating Station project (Santee Cooper). Under its contract with the project owner, Metric was to construct portions of a large power facility in South Carolina. On January 15, 1992, Metric hired Polote under a $431,761 subcontract to do all the sitework or earth moving work for the project. Metric faced a tight schedule for the project and a $5,000 a day liquidated damages penalty for every day it remained onsite beyond the contract deadline.

The work seemed to be progressing well throughout most of the project. Polote and Metric were even discussing bidding together on a future project Georgia Power was developing. However, problems soon developed between Polote and Metric on the Santee Cooper project. First, a dispute arose over Polote's scope of work. Metric contended that Polote was responsible for all sitework on the project, while Polote contended it had not contracted to do backfill work around the project's circulating water pit. Second, another subcontractor obstructed Polote's work area for a time, making it impossible for Polote to complete a section of the sitework. Finally, heavy rains made certain stockpiles of backfill unusable, further delaying the project.

These problems caused Polote to be on-site longer than anticipated, and as a result its insurance expired before the project was completed. A new policy, allegedly, would have cost $10,000; a sum Polote was not willing to pay. It is unclear from the record that Metric was aware that Polote had encountered this insurance problem. Nonetheless, Polote left the job, leaving both the area around the circulating water pit to be backfilled and the spoil piles and borrow areas to be dressed-up. Metric, however, facing liquidated damage penalties, wanted Polote back on the job. Aside from not being insured, Polote could not make an immediate return to the job site because the project guidelines required all workers reentering the site after an absence be retested for drug use—a three day procedure.

Although the record does not provide an entirely clear picture of the succeeding events, it appears Metric performed the backfill work around the circulating water pit to avoid incurring liquidated damages for that portion of the project. Metric also sent Polote a notice of default explaining that if Polote did not return to the job site and dress up the borrow areas and spoil piles, Metric would declare Polote in default, do the work itself and backcharge Polote in accordance with their subcontract. Apparently, upon receipt of the notice of default, Polote asked Metric not to do the unfinished work, and requested a meeting. At the meeting the project superintendent's from both companies discussed the work remaining and the amount Metric would backcharge Polote if Polote did not return to the project. Allegedly, a dispute arose over the amount of the backcharge, and Metric felt compelled to declare Polote in default to guarantee that it would be able to collect the backcharge under the terms of the contract. The backfill work around the circulating water pit and the dressing up of the spoil piles and borrow pits cost Metric $9,412 and $4,902 respectively. Needless to say, Polote and Metric did not leave the Santee Cooper project on amiable terms. Polote left the project feeling it had been a victim of Metric's animus.

Even before the Santee Cooper project began, however, Polote was supposedly put on notice that Metric harbored racial animosity towards the minority firm. Allegedly, Charlie Davis, then group business development manager for Metric, told Benjamin Po-

lote, Polote's president, certain people in Metric did not like Mr. Polote and did not want to work with him because of his race. Polote Aff., at ¶ 11. Evidence of this animosity apparently surfaced early in the project when Ben Polote got in an argument with Larry Tandy, Metric's construction manager, over Polote's scope of work. According to Pravin Shah, Polote's project manager who was present at the meeting, the attitude Mr. Tandy expressed to Polote was racially insulting and abusive. Shah Aff. at 79. Later in the project Metric's project superintendent, Bud Allman, also demonstrated racial animus. During a particularly heated exchange with Pravin Shah, Allman supposedly said: "You fucking Indian, you don't know your ass." Undaunted, Mr. Shah replied: "Excuse me, sir. I don't take this shit from anyone, not even from my mother." Shah Dep. at 68. At a later date, Allman allegedly called another Polote project manager "that damn Hispanic." Polote Aff., at ¶ 12.

The tension between the Metric and Polote only increased after the Santee Cooper project was completed. Metric, sans Polote, was awarded the Georgia Power contract, which Metric and Polote had discussed bidding on together only weeks before. Apparently, Metric had intended to use Polote because the contract originally had a minority participation requirement and included sitework that Metric knew Polote was equipped to perform. However, before Georgia Power awarded the contract for the project it restructured it, dropping the minority participation requirement and separating out the sitework into a stand alone contract. Metric encouraged Polote to bid on the sitework contract by itself, but Polote could not a bid because it could not post a bond.

Polote's distrust of Metric grew after Hurricane Andrew struck in the Fall of 1992, and Metric was hired by the Corps of Engineers as one of six companies to oversee the cleanup effort. Although Metric hired some minority contractors, Polote was not among them. Metric contends that it had awarded all its subcontracts before Polote had shown any interest in bidding. Furthermore, Metric contends the person in charge of awarding the contracts was not aware that Metric

had declared Polote in default on the Santee Cooper project. Polote, in contrast, asserts a "senior Metric corporate representative" told Polote that the senior management at Metric was not letting Polote place bids because they thought Benjamin Polote was a "black guy who is too smart." Aff. B. Polote. Polote also contends in deposition testimony that it bid on at least two Metric subcontracts during the cleanup, but, despite being qualified, was rejected on both.

Polote has bid on other contracts since the Santee Cooper project, but contends that it has been passed over because of the Santee Cooper default and Metric's alleged discussion of the default with other contractors. Polote argues that Metric must have publicized the default or Polote would have been awarded some of the other contracts on which it bid. Metric contends that it did not discuss the Polote default with other companies unless expressly asked.

Seeking redress for the alleged injustices it suffered at the hands of Metric, Polote filed this lawsuit, complaining Metric: (1) violated 42 U.S.C. § 1981 in its contractual dealings with Polote; (2) breached its subcontract with Polote, and (3) tortiously interfered with contractual relationships Polote was developing with third parties. Metric has filed this motion for summary judgment on the counts involving 42 U.S.C. § 1981 and tortious interference.

## II. SUMMARY JUDGMENT

To prevail on its summary judgment motion, the Metric must demonstrate to the Court's satisfaction no genuine issues of material fact exist and that the Court can render a judgment as a matter of law, thus obviating the need for a trial. *Great Lakes Dredge and Dock Co. v. Miller,* 957 F.2d 1575, 1578 (11th Cir.1992).

To counter a well supported motion for summary judgment, the nonmovant "must set forth specific facts showing that there is a genuine need for trial," *Johns v. Jarrard,* 927 F.2d 551, 555 (11th Cir.1991) (citation omitted), and may not rely solely on the pleadings. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91

L.Ed.2d 265 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

■ In assessing whether the movant should prevail in a motion for summary judgment, the district court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmoving party. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir.1992). The Court must avoid weighing conflicting evidence, *Anderson v. Liberty Lobby*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986), or making credibility determinations. *Id.; McKenzie v. Davenport–Harris Funeral Home*, 834 F.2d 930, 934 (11th Cir.1987).

■ "[W]here the facts specifically averred by [the nonmovant] contradict facts specifically averred by the movant, the motion must be denied." *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 886, 110 S.Ct. 3177, 3188, 111 L.Ed.2d 695 (1990). More than a "scintilla" of evidence, however, is needed to establish such a contradiction. *E.g., Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.1990).

## III. ANALYSIS

### A. Count I

In Count I Polote claims that Metric discriminated against it when Metric declared Polote in default on the Santee Cooper project, when Metric did not enter into a joint venture with Polote on the Georgia Power project, and when it did not award Polote any subcontracts on the Hurricane Andrew cleanup project. Polote also argues that Metric interfered with Polote securing other subcontracts and racially harassed two Polote employees during the Santee Cooper project.

Polote argues in its Memorandum in Opposition to Summary Judgment that Metric visited this racial discrimination upon Polote because Polote wanted more than a "share cropper" relationship with Metric and thus

needed to be cut "down to size." Pltf. MOSJ at 9. In response Metric argues that it gave Polote preferential treatment over the last several years to develop a minority subcontractor on which it could rely and thus had absolutely no reason to, nor did it, discriminate against Polote.

### 1. Current Scope of Section 1981

In Count I of its complaint, Polote asserts that Metric is liable under 42 U.S.C. § 1981. Section 1981 provides in relevant part that "[a]ll persons ... shall have the same right ... to *make and enforce contracts*, ... as is enjoyed by white citizens...." 42 U.S.C. § 1981(a) (emphasis added). The interpretation of the phrase "make and enforce contracts" has experienced some dramatic changes in recent years.

Although earlier lower court decisions interpreted this phrase broadly to proscribe racial discrimination in all aspects of contract relations, *see Rivers v. Roadway Express*, — U.S. ——, ——, 114 S.Ct. 1510, 1520, 128 L.Ed.2d 274, 289 (1994), in its 1989 decision in *Patterson v. McLean Credit Union*, 491 U.S. 164, 179, 109 S.Ct. 2363, 2373, 105 L.Ed.2d 132, the U.S. Supreme Court stated the provision "covers only conduct at the initial formation of the contract and conduct which impairs the right to enforce contract obligations through legal process," as these are the only actions specifically enumerated in the provision. *Id.* at 179–80, 109 S.Ct. at 2373–74. The Court reasoned that if section 1981 were read expansively it would unnecessarily intrude on the protections offered to employees under Title VII of the Civil Rights Act of 1964. 42 U.S.C. § 2000e.

Two years after *Patterson*, and one year after a failed attempt to amend section 1981, *see* Civil Rights Act of 1990, S. 2104, 101st Cong., 2d Sess., § 12 (1990), Congress enacted the Civil Rights Act of 1991. The Act defined "make and enforce" broadly to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, *privileges, terms,* and *conditions* of the contractual relationship." 42 U.S.C. § 1981(b) (emphasis added). Defining "make and enforce" in this way, Congress made it clear that the section

1981 proscription against racial discrimination extended far beyond the narrow confines of the *Patterson* decision. By borrowing the "privileges, terms and conditions" language from Title VII, Congress also made it clear that it did not find the overlap between section 1981 and Title VII problematic. *See* 42 U.S.C. § 2000e–2.

The Act became effective on November 21, 1991, before this dispute arose, P.L. 102–166, Title I, § 101. Thus, the Court must apply section 1981 as amended here. Because the Act does not apply retroactively, see *Rivers,* — U.S. —, —, 114 S.Ct. 1510, 1520, 128 L.Ed.2d 274, 289 (1994), very few courts have had occasion to apply the Amendments. *See, e.g., Hunter v. Citibank, N.A.,* 862 F.Supp. 902, 907 (E.D.N.Y.1994). Other recent decisions applying section 1981 have been bound by the *Patterson* test as the cases were filed prior to the effective date of the Amendments. *See, e.g., Hooks v. Diamond Crystal Specialty Foods, Inc.,* 997 F.2d 793, 800–1 (1993).

Considering the lack of guidance on the breadth of section 1981 after the 1991 amendments, it is fortunate that the claims in this case fit clearly within the new section 1981 definition of "make and enforce" provided above. Declaring a default is closely analogous to a contract "termination" and failing to enter into a joint venture or subcontract is encompassed by "making" a contract. 42 U.S.C. § 1981(b). While Polote has demonstrated that all its Count I claims fall within section 1981, all of these claims do not survive the tests for proving racial discrimination.

### 2. Application of Title VII Tests of Racial Discrimination in Section 1981 Cases

Although Congress effectively overruled *Patterson's* restrictive interpretation of section 1981's scope by enacting the Civil Rights Amendments of 1991, *Patterson* still stands for the proposition that the Title VII tests for racial discrimination can be applied in section 1981 cases. *Patterson,* 491 U.S. at 186, 109 S.Ct. at 2377; *Howard v. BP Oil Co., Inc.,* 32 F.3d 520, 524 (11th Cir.1994).

Although there are many ways to prove racial discrimination, see, e.g. *Furnco Con-struction Corp. v. Waters,* 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978); *International Brotherhood of Teamsters v. U.S.,* 431 U.S. 324, 357–58, 97 S.Ct. 1843, 1865–66, 52 L.Ed.2d 396 (1977); *McCuen v. Home Insurance Co.,* 633 F.2d 1150, 1151–52 (5th Cir.1981), two different frameworks for such analysis are generally applied. The first is used when direct evidence of racial discrimination is available, the second when only indirect or circumstantial evidence is available. The ultimate goal of each test, regardless of the type of evidence presented, is to determine whether the plaintiff has established itself as a victim of intentional discrimination. *Randle v. LaSalle Telecommunications, Inc.,* 876 F.2d 563, 568 (7th Cir.1989).

### a. Direct Evidence of Racial Discrimination

■ When a plaintiff has direct evidence of racial discrimination, the task is much easier. Direct evidence is any evidence that proves a fact in question without reliance upon inference or presumption. *LaSalle Telecommunications,* 876 F.2d at 569; *Lee v. Russell County Board of Education,* 684 F.2d 769, 774 (11th Cir.1982). It must speak directly to the discriminatory intent as well as relate to the specific action in question. *LaSalle Telecommunications,* 876 F.2d at 569 (citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 251, 109 S.Ct. 1775, 1791, 104 L.Ed.2d 268 (1988)). An example of such direct evidence would be an employer's statement that he fired an employee because of his race. *Caban–Wheeler v. Elsea,* 904 F.2d 1549 (11th Cir.1990); *Wilson v. City of Aliceville,* 779 F.2d 631, 635 (11th Cir.1986).

■ A plaintiff relying on such direct evidence must use it to prove a prima facie case of racial discrimination. *Lee v. Russell Co. Board of Education,* 684 F.2d 769, 774 (11th Cir.1982). If the trier of fact believes the prima facie evidence, "the ultimate issue of discrimination is proved." *Id.* The defendant can rebut the prima facie evidence only by proving by a preponderance of the evidence that it would have made the same decision with or without the racial factor. *Id.* (citing *Mt. Healthy City School District*

*v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *City of Aliceville,* 779 F.2d at 634).

### b. Indirect Evidence of Racial Discrimination

■ The indirect evidence test was first articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and involves a *three tiered* analysis. Tier one requires the plaintiff to prove by a preponderance of the evidence a prima facie case of racial discrimination. If the plaintiff is successful, tier two is reached where the burden of production shifts to the defendant to articulate, not prove, a legitimate, nondiscriminatory reason for the discriminatory treatment alleged. *Id.* at 802, 93 S.Ct. at 1824; *City of Aliceville,* 779 F.2d at 634. Should the defendant carry this burden, the plaintiff, in tier three, has the opportunity to demonstrate by a preponderance of the evidence that the reasons proffered by the defendant were not true reasons, but merely pretext for discrimination. *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. at 1825. Despite the shifting burdens of proof, the ultimate burden of persuasion, remains at all times with the plaintiff. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1980).

### 1. Tier One—Prima Facie Case

■ To establish a prima facie case through indirect evidence a plaintiff may apply the four prong test articulated in *McDonnell Douglas.* The test provides that a Title VII complainant who claims that he was not hired for position because of his race can establish a prima facie case of such discrimination on indirect evidence alone by showing:

(i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. As the Supreme Court provides in footnote 13 of its opinion, this test is by no means rigid—as factual scenarios vary, so will the prongs of the test. *Id.* It is intended only as a tool to "sharpen inquiry into the elusive factual question of intentional discrimination." *Burdine,* 450 U.S. at 254 n. 8, 101 S.Ct. at 1094 n. 8.

Accordingly, the test has been adapted in other contexts such as improper discharge, *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093; *La Montagne v. American Convenience Products, Inc.,* 750 F.2d 1405, 1409 (7th Cir. 1984), and failure to promote. *Jones v. Firestone Tire and Rubber Co. Inc.,* 977 F.2d 527, 536 (11th Cir.1992). The Court finds the *McDonnell Douglas* test is adaptable to three specific claims in this case, Metric's decision to declare Polote in default on the Santee Cooper project, Metric's decision not to enter into a joint venture with Polote on Santee Cooper, and Metric's alleged decision not to award subcontracts to Polote during the Hurricane Andrew cleanup project. Each of these are discussed individually below.

### 2. Tier Two—Nondiscriminatory Reason

■ Establishing a prima facie case yields a rebuttable presumption that the defendant discriminated against the plaintiff. *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094. When confronted with indirect evidence alone, to rebut the presumption the defendant "need only produce admissible evidence which would allow the trier of fact rationally to conclude that the [defendant's action] had not been motivated by discriminatory animus." *Id.* at 257, 101 S.Ct. at 1095. Since the defendant is under a burden of production, rather than persuasion, he need not "persuade the court that [he] was actually motivated by the proffered [nondiscriminatory] reasons." *Id.* at 254, 101 S.Ct. at 1094. The reasons, however, must be "clear and reasonably specific." *Id.* at 258, 101 S.Ct. at 1096.

### 3. Tier Three—Proving Pretext

■ If the defendant successfully overcomes the plaintiff's prima facie case, the plaintiff can respond by demonstrating that the reasons given by the defendant for the

alleged discriminatory treatment were simply pretext and not the true reasons for the defendant's actions. The plaintiff may prove this either "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095.

### 3. Polote's Specific Claims

#### a. Santee Cooper Default

Polote has offered no direct evidence to prove Metric's decision to declare Polote in default was racially motivated. Although the racial remarks allegedly made by Metric's project superintendent, Bud Allman, and construction manager, Larry Tandy, might be considered direct evidence of racial harassment, they do not speak *directly* to the cause of default. *See LaSalle Telecommunications,* 876 F.2d at 569 (citing *Price Waterhouse v. Hopkins,* 490 U.S. 228, 251, 109 S.Ct. 1775, 1791, 104 L.Ed.2d 268 (1988); *City of Aliceville,* 779 F.2d at 635).

The alleged remarks, however, do serve as indirect evidence that Polote was defaulted for racial reasons. *Id.* Again, *McDonnell Douglas* provides the general framework for determining whether a plaintiff, using indirect evidence alone, has established a prima facie case of discrimination. While this test is not the only way to prove racial discrimination through indirect evidence, see, e.g. *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), and while the facts surrounding this case do not lend themselves to a strict adherence to the test, the test bears examination.

Under the *McDonnell Douglas* framework, as modified to the facts before the Court, if Polote could prove by a preponderance of the evidence that: (1) it is a minority subcontractor, (2) it was performing its work in an acceptable manner, (3) Metric declared it in default, and (4) Metric sought other subcontractors to replace it, Polote could, without more, establish a prima facie case of racial discrimination. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824.

While Polote can demonstrate that it is a minority contractor, that it performed satisfactorily throughout virtually all of the contract, and was declared in default, it cannot prove that Metric sought other subcontractors to replace it. Polote's inability to prove this prong, however, is not fatal to it claim. The alleged racial remarks made by Bud Allman and Larry Tandy's "take it or leave it attitude," could be considered as evidence at least some individuals at Metric harbored racial animosity. What is not clear from the record is whether either of these individuals helped decide whether Polote should be declared in default.

Considering this, and viewing Polote's evidence in a light most favorable to Polote, *Celotex Corp.,* 951 F.2d at 1237, the Court finds that Polote has made out a prima facie case that the Santee Cooper default was racially motivated. Thus, Polote has reached tier two of our inquiry.

In rebuttal Metric contends that it declared Polote in default because Polote abandoned its equipment and walked off of the project. Metric wanted Polote to finish the project and issued a notice of default letter in an attempt to coax Polote into returning. Polote did not, so Metric declared them in default, contending that this was the only way under the terms of their contract that they could backcharge Polote for the work Metric did on Polote's behalf.

Although this appears to be a legitimate nondiscriminatory reason for defaulting Polote, it is flawed by a factual dispute between the parties that cannot be resolved short of trial. Polote asserts that Metric could have received the $4,902 backcharge without declaring Polote in default. At the time of the default, Metric was holding payments owed to Polote far in excess of this amount. Furthermore, Metric has attempted to backcharge Polote for other work Metric allegedly did for Polote prior to issuing the default. It is not the Court's place to weigh conflicting evidence at this juncture. In the face of contradictory assertions, a motion for summary judgment must be denied. *Liberty Lobby,* 477 U.S. at 255, 106

S.Ct. at 2513. Accordingly, the Court reserves this claim for trial.

### b. Georgia Power Project

■ Next, Polote contends that Metric discriminated against Polote when it decided not to enter into a joint venture relationship with Polote on the Georgia Power project contract. Applying *McDonnell Douglas* in this situation, the Court finds that to establish a prima facie case, Polote would have to show that: (1) it is a minority subcontractor, (2) it was qualified to be a joint venture partner with Metric on the project, (3) Metric rejected any participation by Polote, and (4) Metric sought other subcontractors in Polote's stead. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824.

■ The *McDonnell Douglas* test does not apply cleanly to these facts either because Metric did not seek assistance on the Georgia Power project from any firm other than Polote. However, Polote can prove the other three prongs. It is a minority contractor, it was qualified for the job, and Metric rejected its offer to participate on the project. As in the default claim, absent proof of prong four, though, more is needed to prove a prima facie case.

Polote relies on evidence that Georgia Power was actively seeking minority participation on the project and encouraged Metric to work with Polote. Polote contends further that Metric informed Georgia Power of the default, causing Georgia Power to change the contract. Since the legitimacy of the default is still in question, the legitimacy of Metric's decision to inform Georgia Power is tainted itself by the specter of racial discrimination. Accordingly, the Court, for the purposes of this summary judgment decision, finds that Polote has established a prima facie case that Metric acted improperly in its treatment of Polote on the Georgia Power contract.

In rebuttal, Metric counters that although it did discuss entering into a joint venture or a subcontract with Polote on the Georgia Power project, it only did so because initially the contract it intended to bid on had a minority firm participation requirement and because it included sitework. Later, Georgia Power dropped the minority participation requirement and made the sitework a separate contract. Because Metric needed Polote only for the sitework portion of the original contract, when the contract was severed it bid on the pared down contract by itself.

■ Again Metric has provided a seemingly legitimate nondiscriminatory reason for not using Polote on the Georgia Power project, however, Polote in response contends, first, that Metric had a hand in shaping Georgia Power's decision to pare down the contract and remove the minority requirement, and second, that even in light of the parred down contract, there was work that Polote was equipped to do. This contradiction between Metric and Polote is enough for the Court to deny summary judgment as to this claim. *Lujan*, 497 U.S. at 886, 110 S.Ct. at 3188.

### c. Hurricane Andrew Cleanup

Polote next contends that Metric discriminated against Polote in not awarding subcontracts to the company to assist in the cleanup of southern Florida in the aftermath of Hurricane Andrew. Metric was one of six contractors in charge of administering the cleanup effort and did not award any contracts to Polote. Polote apparently was having difficulty bidding on Metric subcontracts, when, as recounted above, a "senior Metric corporate representative" allegedly told Ben Polote that the senior management at Metric was not letting Polote place bids because they thought Benjamin Polote was a "black guy who is too smart." Polote Aff. at 4. Although Polote contends it did eventually succeed in placing two bids on Metric subcontracts, both were rejected. Polote Dep. at 54

■ In this situation, the *McDonnell Douglas* framework applies in full. Polote is a minority subcontractor, it was qualified for a subcontract on which it bid, it was not awarded the subcontract, and another firm was. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. Satisfying all prongs of the test, Polote establishes an inference of racial discrimination. *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. This inference is further bolstered by the Metric senior corpo-

rate management representative's alleged statement people with Metric think that Ben Polote is a "black guy who is too smart," and therefore is not being allowed to bid.

■ In rebuttal, Metric contends the reason it did not award any subcontracts to Polote was that Polote did not express any interest in the Hurricane Andrew Cleanup work until after Metric had let all its subcontracts. While this is a legitimate nondiscriminatory reason for not awarding Polote any of the cleanup subcontracts, it too is subject to dispute, since Polote contends it did in fact bid on two of Metric's cleanup subcontracts. In light of this dispute, this issue too must go to trial. *Lujan,* 497 U.S. at 886, 110 S.Ct. at 3188.

#### d. Interference with Other Contracts

■ Polote also contends that Metric has interfered with Polote's attempts to secure contracts from third parties. Here Polote does not succeed in making a prima facie case. Although the burden for establishing a prima facie case is not onerous, *Patterson,* 491 U.S. at 186, 109 S.Ct. at 2377, it cannot be based on speculation alone. Polote only offers in support of its position that Polote has had difficulty securing contracts since the Santee Cooper default; therefore, it must be because Metric has been publicizing the default to other contractors and project owners. This evidence is not sufficient to even pass the forgiving prima facie test. More than a scintilla of evidence is needed for a claim to reach the courtroom. *See Walker,* 911 F.2d at 1577.

### B. Count III

In Count III of the complaint, Polote contends that Metric's actions give rise under Georgia law to tortious interference with contractual relationships and tortious interference with prospective business advantage.

#### 1. Tortious Interference with Contractual Relations

■ Under Georgia law to establish a claim for tortious interference with contractual relationships the plaintiff must prove that the defendant (1) knowingly interfered in; and (2) damaged; (3) an existing contractual relationship; (4) the plaintiff had with a third party. *See Robles v. Humana Hosp. Cartersville,* 785 F.Supp. 989, 1002–03 (N.D.Ga.1992); *Carolina Furniture Co. Inc., v. Rhodes, Inc.,* 603 F.Supp. 69, 79 (S.D.Ga. 1984). To defeat Polote's claim, Metric need only defeat one of these elements. *Rogers v. Coronet Ins. Co.,* 206 Ga.App. 46, 52, 424 S.E.2d 338 (1992).

■ Metric accomplishes this task by showing Polote has not provided any evidence of a contract with which Metric could have interfered. Although Polote mentions several contracts that it either bid or tried to bid on, Polote was not awarded a contract in any of these cases. Without a contractual relationship, Polote's claim must fail. *Green v. Johnston Realty,* 212 Ga.App. 656, 658, 442 S.E.2d 843 (1994).

### 2. Tortious Interference with Prospective Business Relationships

■ Under Georgia law to establish a claim of tortious interference with prospective business relationships, Polote must prove the following elements:

> [T]he [Metric] (1) acted improperly and without privilege; (2) acted purposely and with malice with the intent to injure; (3) induced a third party or parties not to enter into or continue a business relationship with [Polote]; and (4) caused some financial injury to [Polote].

*Green,* 212 Ga.App. at 659–660, 442 S.E.2d 843. Again, by disproving any one of these elements, Metric can prevail as to this claim. *Id.*

As the basis of its claim, Polote contends that Metric announced Polote's default on the Santee Cooper project to several entities including Georgia Power, Savannah Electric and Power Company (hereinafter "Savannah Electric"), the Orlando Utilities Commission (hereinafter "Orlando Utilities"), and the Army Corps of Engineers (hereinafter "Corps"). Polote alleges that Metric announced Polote's default to avoid having to do work with Polote in a joint venture or subcontract relationship on the Georgia Power and Savannah Electric projects.

Although Metric admits that it may have discussed Polote's default with Georgia Power, it denies that it volunteered this information to Savannah Electric, Orlando Utilities, or the Corps. Metric contends, as discussed above, the reason it did use Polote on the Georgia Power project was because Georgia Power decided to sever the sitework portion of contract from that portion awarded to Metric. Metric further contends that the reason Metric did not award any subcontracts to Polote during the Hurricane Andrew cleanup operation is because Polote did not submit any bids.

■ Even without the benefit of Metric's explanation, the Court finds that Polote has not provided sufficient evidence to prove the second element of its claim—that Metric "acted purposely and with malice with the intent to injure" Polote. As to the Georgia Power project, Polote can demonstrate at best that Metric did not want enter into a joint venture with Polote. Even if Polote could establish that Metric encouraged Georgia Power to separate out the sitework into a new contract, there is nothing in the record that indicates any malice was involved. Polote has pointed toward even less evidence showing Metric acted with malice as to the other projects.

■ Even if Polote's could show that Metric acted with malice regarding the Hurricane Andrew subcontracts, Polote's claim still fails. The dispute over these subcontracts only involved two parties, Polote and Metric. The third element of a claim of contractual interference with a prospective contractual relationship requires the participation of three parties—two to contract and one to interfere. *Green*, 212 Ga.App. at 659–660, 442 S.E.2d 843. In this instance only the contracting parties are present, and consequently, Polote's claim fails.

■ As to the remaining counts of prospective contractual interference, Polote offers only speculation to support it claim, reasoning that since it did not get certain contracts, it must have been because Metric publicized the Santee Cooper default throughout the construction industry. More than a scintilla of evidence this is not. *Walk-*

*er*, 911 F.2d at 1577. Accordingly, these claims fail as well.

## IV. CONCLUSION

Because genuine issues of material fact exist as to some, but not all, of Plaintiff's claims, the Court **DENIES** the Defendant's motion for summary judgment in part and **GRANTS** it in part. The Court **DENIES** Defendant's motion as to all claims in Count I, except for the last which encompasses instances of discriminatory contractual interference involving projects other than Santee Cooper, Georgia Power, and Hurricane Andrew. As to this claim, the Court **GRANTS** the Defendant's motion.

In Count III, the Court **GRANTS** the Defendant's motion as to the claim of tortious interference with contractual relationships. The Court also **GRANTS** the Defendant's motion as to all claims of tortious interference with prospective business relationships.

SO ORDERED.